773 A.2d 18

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT, v. JESSE TIMMENDEQUAS, DEFENDANT–APPELLANT.

Argued September 12, 2000—Decided February 1, 2001.

---

22

*Jay L. Wilensky*, Assistant Deputy Public Defender, argued the cause for appellant (*Ivelisse Torres*, Public Defender, attorney; *Mr. Wilensky* and *Claudia Van Wyk*, Deputy Public Defender, of counsel and on the briefs).

*Catherine A. Foddai*, Deputy Attorney General, argued the cause for respondent (*John J. Farmer, Jr.*, Attorney General of New Jersey, attorney).

The opinion of the Court was delivered by

ZAZZALI, J.

This appeal concerns the capital sentencing of Jesse K. Timmendequas, who was convicted of the 1994 murder of seven-year-old Megan Kanka. We affirmed defendant's conviction and death sentence on direct appeal. *State v. Timmendequas*, 161 *N.J.* 515, 640, 737 *A.*2d 55 (1999) (*Timmendequas I*). We also acknowledged his request for proportionality review. *Ibid.* We now conclude, upon review, that defendant's death sentence is not

disproportionate when compared to the sentences imposed in similar cases.

The notoriety of this case renders our effort to evaluate defendant's claim that his death sentence is disproportionate all the more critical. "One can say with certainty that the crime committed by Jesse Timmendequas was horrific, so uniformly condemned that it changed the legal landscape for sex offenses nationwide." *Timmendequas I, supra,* 161 *N.J.* at 650, 737 *A.*2d 55 (Handler, J., dissenting). The murder of Megan Kanka sparked outrage after the public learned that defendant had been twice convicted of sex offenses against children, and that Megan's community had not been made aware of those convictions. *E.B. v. Verniero,* 119 *F.*3d 1077, 1081 (3d Cir.1997), *cert. denied,* 522 *U.S.* 1110, 118 *S.Ct.* 1039, 140 *L.Ed.*2d 105 (1998); *Timmendequas I, supra,* 161 *N.J.* at 641, 737 *A.*2d 55 (Handler, J., dissenting). Megan's parents, Maureen and Richard Kanka, successfully pressed for a law requiring notification when sexual predators become neighbors. *Timmendequas I, supra,* 161 *N.J.* at 569, 737 *A.*2d 55; See *L.* 1994, c. 133 (enacting "Megan's Law" registration requirements, later codified at *N.J.S.A.* 2C:7-1 to –5); *L.* 1994, c. 128 (enacting community notification requirements, later codified at *N.J.S.A.* 2C:7-6 to–11). Megan's murder also inspired a similar effort across the country. *E.B., supra,* 119 *F.*3d at 1081; *Timmendequas I, supra,* 161 *N.J.* at 569, 737 *A.*2d 55. That movement culminated in a 1996 federal "Megan's Law." *E.B., supra,* 119 *F.*3d at 1082 n. 1 (discussing *Pub.L. No.* 104–145, 110 *Stat.* 1345 (1996), which was codified at 42 *U.S.C.A.* § 14071).

We set forth that background because it underscores the importance of a careful and comprehensive proportionality review, as an improper death sentence would result in "the ultimate injustice." *State v. Ramseur,* 106 *N.J.* 123, 374, 524 *A.*2d 188 (1987) (Handler, J., dissenting). Sensitive to that concern, our single task in this appeal is to determine if defendant's death sentence is disproportionate when compared to the sentences of other similar offenders.

## TABLE OF CONTENTS

I. THE FACTS ...................................... 29

II. INDIVIDUAL PROPORTIONALITY REVIEW ........ 34
 A. UNIVERSE OF CASES ......................... 34
 B. FREQUENCY ANALYSIS ...................... 37
 C. PRECEDENT–SEEKING REVIEW ............. 40
 1. RELEVANT FACTORS .................... 40
 a. Defendant's Moral Blameworthiness ........ 41
 b. Degree of Victimization .................. 42
 c. Character of Defendant .................. 43
 2. CASE COMPARISONS ..................... 44
 a. Agreed Upon Cases ..................... 45
 1) Death Sentences ..................... 45
 2) Life Sentences ....................... 47
 b. Contested Cases ........................ 51

III. OTHER ARGUMENTS ........................... 56

IV. CONCLUSION .................................. 56

\* \* \*

## I. *THE FACTS*

This Court's opinion in the direct appeal contains the facts in detail. *Timmendequas I, supra,* 161 *N.J.* at 534–50, 737 *A.*2d 55. We set forth here only those facts, both from the direct appeal and the record, that are necessary for proportionality review.

On July 29, 1994, seven-year-old Megan Kanka lived with her parents in Hamilton Township, diagonally across the street from defendant. At about 5:30 p.m., defendant lured Megan into his house, ostensibly to play with his puppy. He drew her into his bedroom where he attempted to sexually assault her. She screamed and tried to escape but defendant, fearing detection, would not let her leave. Megan fought for her life as defendant strangled her with a belt until she lost consciousness. During the struggle, Megan hit her face on a dresser and her head on a door, causing bleeding. To avoid blood stains on the carpet, defendant placed a plastic bag over her head. Defendant then sexually

assaulted Megan. Those facts are recounted fully in *Timmende-quas I, supra*, 161 *N.J.* at 541–43, 737 *A.*2d 55.

Believing Megan to be dead, defendant placed her body in a toy box and carried it downstairs. When he put the box in his truck, he thought he heard Megan cough. He drove to Mercer County Park, took Megan's body out of the box, and placed her in tall weeds. Before he left, he sexually assaulted her again.

Megan's family called police when she did not return home. Officers arrived and joined neighbors in the search for Megan. Defendant participated in the search, handing out fliers with Megan's picture. Defendant told the police that he had seen Megan riding a bicycle at 2:30 in the afternoon. That statement conflicted with his prior statement to Maureen Kanka that he last saw Megan before dinner. Police asked defendant if he had seen Megan at any other time. He said he saw Megan riding her bicycle in front of his home between 5:30 and 6:00 p.m.

The police obtained the consent of the homeowner, defendant's roommate, to search defendant's living quarters. Police questioned defendant again in the house. Shaking and perspiring, defendant said that he saw Megan and a friend between 5:00 and 5:30 p.m. while he was washing his boat. The police then interviewed defendant at the police station where he gave conflicting statements concerning his whereabouts during the time of Megan's disappearance. Soon thereafter, he was released.

The following day, at police headquarters, defendant told the police that Megan was dead and that he had left her body in Mercer County Park. He did so at the prompting of his roommate, after repeatedly denying involvement. Defendant led the police to the body and, on the drive back to the police station, he recounted what had happened. At the station, in a formal statement, he confessed to the murder and some but not all aspects of the sexual assault. After the police presented him with the results of the autopsy, he provided further details of the sexual assault, the head injuries, and other conduct described above.

Defendant did not testify or present witnesses on his behalf at the guilt phase of the trial, which was held from May 5 to May 30, 1997. The jury found him guilty of purposeful-or-knowing murder, two counts of felony murder, first-degree kidnapping, and four counts of first-degree aggravated sexual assault.

The penalty phase of the trial commenced on June 9 and continued to June 20, 1997. The jury concluded that the aggravating factors outweighed the mitigating factors beyond a reasonable doubt. The court sentenced defendant to death.

■ In our proportionality review, we consider testimony adduced at the penalty phase together with the evidence elicited at the guilt phase. Defendant offered two witnesses who presented evidence of mitigating circumstances in his background.

Carol Krych, a forensic social worker, testified that defendant's mother was a promiscuous alcoholic who had ten children by seven different men. Defendant's father was a violent drinker with a criminal history. Krych testified, based on information provided by defendant's mother, that defendant was raised in poverty, the family lived for a time in a shack, and defendant was often cold, dirty, hungry and without adequate medical care. Other sources told Krych that defendant's father had sexually abused defendant and his brother Paul frequently, that the two brothers once saw their father rape a seven-year-old girl, that the father tortured and killed their pets, and that he once forced the brothers to eat their pet rabbit. Krych therefore concluded that defendant had a severely dysfunctional family life.

Krych added that defendant had been diagnosed with emotional problems as a youth and was classified as "educable mentally retarded," but conceded that a conflict existed with respect to that classification. She also acknowledged that she had not testified on direct regarding academic reports that indicated defendant had made good progress in school. Krych further admitted that although Paul originally said defendant should not be sentenced to death, she had since heard that he had changed his mind.

Defendant's second expert, Dr. John Podboy, a psychologist, relied upon the Krych report but never evaluated defendant personally. Podboy found that defendant suffers from pedophilia, borderline mental retardation, fetal alcohol effect, and a schizoid personality disorder. He testified that defendant likely had "generalized anxiety, ... perhaps ... includ[ing] post-traumatic stress disorder." Podboy expressed the opinion that, at the time of the crime, defendant was under "extreme emotional disturbance" and that his "capacity to appreciate the wrongfulness of his conduct was very much impaired," as was his ability "to conform his conduct ... to the requirements of the law." He also concluded that defendant may have had a serious brain abnormality, which could reflect a post-traumatic insult, a vascular insult, or a congenital abnormality. Megan's death, said the psychologist, was caused by a reflexive response to the panic defendant felt when the victim attempted to flee.

The State presented rebuttal witnesses. Two detectives testified that people to whom they spoke about defendant's childhood said that defendant's mother was not constantly intoxicated, that defendant's house was not substandard, and that his clothing was not disheveled. One detective testified that Paul Timmendequas told him that their father physically abused Paul and defendant, and that their mother broke defendant's arm when defendant was seventeen years old. According to the detective, Paul gave several inconsistent statements regarding sexual abuse, at one point even denying that he knew whether defendant had been abused at all. Paul also claimed that he was drunk when he spoke with Krych.

Dr. Robert L. Sadoff, a psychiatrist, said that there was no evidence to support defendant's claims of extreme emotional disturbance and diminished capacity. Sadoff said that defendant's description of his own conduct demonstrated that defendant was in control of the situation and had simply acted logically to avoid apprehension. Sadoff also said that defendant's I.Q., seventy-four,

showed that he had borderline intelligence that did not prevent him from functioning or appreciating the nature of his conduct.

In his allocution statement, defendant said:

> Okay. I am sorry for what I've done to Megan. I pray for her and her family every day. I have to live with this and what I've done for the rest of my life. I ask you to let me live so I, some day, I can understand and have an understanding why something like this could happen. Thanks.

The jury unanimously found the *N.J.S.A.* 2C:11–3c(4)(f) (escape detection) and c(4)(g) (contemporaneous felony) aggravating factors. *Timmendequas I, supra,* 161 *N.J.* at 534, 548, 737 *A.2d* 55. Four jurors found the c(5)(a) (extreme emotional disturbance) mitigating factor to be present. Two jurors found the c(5)(d) (diminished capacity) factor. Jurors in varying numbers found the following c(5)(h) (catchall) mitigating factors, which defendant had submitted to the jury:

> [D]efendant (1) did not plan in advance to kill or seriously injure the victim (twelve jurors); (2) felt remorse (six jurors); (3) was subjected to years of sexual and physical abuse by his father, including but not limited to fondling, forced oral sex, anal penetration, and beatings by his father's hand or a strap (three jurors); (4) was exposed to domestic violence between his mother and several of her paramours (twelve jurors); (5) was born to a father who had a history of incarceration, drank excessively and totally disregarded the needs of his family and even their lives (eleven jurors); (6) was born to a promiscuous mother who had ten children by seven different men and gave up or had to relinquish seven of these children to the State (twelve jurors); (7) was raised in an atmosphere that did not provide him with stability, having moved twenty-one times by the time he was seventeen years old (twelve jurors); (8) was born to a mother who was emotionally unfit and unable to meet his physical and emotional needs and caused him to suffer from fetal alcohol effect due to her drinking throughout her pregnancy (four jurors); (9) suffered traumatic loss when his stepfather, the only father figure who did not abuse him, died (seven jurors).
>
> [*Id.* at 549–50, 737 *A.2d* 55.]

The jury unanimously concluded that defendant's "childhood and adolescence were characterized by exposure to domestic violence, criminal activity, substance abuse, instability of the home, emotional and physical neglect and possible physical and sexual abuse. His parents did not serve as role models of normal behavior and treated him poorly. Also, the family was poor and received public assistance." The jury rejected several other proposed catchall mitigating factors.

The jury, nonetheless, unanimously found that each aggravating factor outweighed the mitigating factors beyond a reasonable doubt. Accordingly, the court sentenced defendant to death, as required by *N.J.S.A.* 2C:11–3c(3)(a). On the kidnapping count, the court imposed a life sentence with a twenty-five-year parole disqualifier. As noted, this Court affirmed defendant's convictions and sentence on direct appeal.

## II. *INDIVIDUAL PROPORTIONALITY REVIEW*

■ At a capitally-sentenced defendant's request, *N.J.S.A.* 2C:11–3e, we engage in proportionality review "to ensure that the death penalty is being administered in a rational, non-arbitrary, and evenhanded manner, fairly and with reasonable consistency." *State v. Marshall,* 130 *N.J.* 109, 131, 613 *A.*2d 1059 (1992) (*Marshall II* ), *cert. denied,* 507 *U.S.* 929, 113 *S.Ct.* 1306, 122 *L.Ed.*2d 694 (1993). To that end, proportionality review focuses on whether a specific defendant's death sentence is inconsistent with the penalty imposed in comparable cases. *State v. DiFrisco,* 142 *N.J.* 148, 160, 662 *A.*2d 442 (1995) (*DiFrisco II* ), *cert. denied,* 516 *U.S.* 1129, 116 *S.Ct.* 949, 133 *L.Ed.*2d 873 (1996); *State v. Martini,* 139 *N.J.* 3, 20, 651 *A.*2d 949 (1994) (*Martini II*). The defendant must demonstrate that his or her death sentence is aberrant, arbitrary, or otherwise anomalous. *In Re Proportionality Review,* 161 *N.J.* 71, 76–77, 735 *A.*2d 528 (1999) (*Proportionality Review I*); *State v. Harvey,* 159 *N.J.* 277, 289–90, 731 *A.*2d 1121 (1999) (*Harvey III*).

### A. *UNIVERSE OF CASES*

■ In order to compare this case with similar death-eligible cases, we must first determine the "universe" of cases from which we draw the comparison cases. An amendment to *N.J.S.A.* 2C:11–3e sought to limit "this comparison group to only those cases in which a death sentence had actually been imposed." *State v. Chew,* 159 *N.J.* 183, 196, 731 *A.*2d 1070 (1999) (*Chew II*), *cert. denied,* 528 *U.S.* 1052, 120 *S.Ct.* 593, 145 *L.Ed.*2d 493 (1999). This Court has concluded, however:

[A] universe limited to cases in which the death-penalty sentence has been imposed cannot support a coherent proportionality system. This is so because "[w]ithout knowledge of the life-sentenced cases, [a court] would be unable to determine whether there is a 'meaningful basis' for distinguishing the death sentences it reviews from the 'many cases' in which lesser sentences are imposed."

[*Proportionality Review I, supra*, 161 *N.J.* at 84, 735 *A.*2d 528 (quoting David S. Baime, *Report to the New Jersey Supreme Court: Proportionality Review Project* at 10 (Apr. 28, 1999) (*Baime Report* )).]

We thus consider all death-eligible cases, rather than only death-sentenced cases. We also consider death-eligible cases "whether or not they were capitally prosecuted," *State v. Harris*, 165 *N.J.* 303, 315, 757 *A.*2d 221 (2000) (*Harris II*), because the decision not to seek the death penalty "is not necessarily a reflection of [the] defendant's lack of deathworthiness." *Martini II, supra*, 139 *N.J.* at 27, 651 *A.*2d 949. Thus, all cases in which the defendant was eligible for the death penalty comprise the universe under consideration.

In order to aid our proportionality review process, the Administrative Office of the Courts (AOC) maintains a database of all death-eligible cases. The AOC has subdivided the cases into thirteen distinct categories of comparison cases. *State v. Cooper*, 159 *N.J.* 55, 71, 731 *A.*2d 1000 (1999) (*Cooper II*), *cert.denied*, 528 *U.S.* 1084, 120 *S.Ct.* 809, 145 *L.Ed.*2d 681 (2000). The AOC assigns cases for comparison to the following categories:

(A) Victim is a Public Servant;

(B) Prior Murder Conviction without A above;

(C) Contract Killing without A–B above;

(D) Sexual Assault without A–C above (subdivided into (1) aggravated and (2) other);

(E) Multiple Victims without A–D above (subdivided into (1) aggravated and (2) other);

(F) Robbery without A–E above (subdivided into (1) home, (2) business, and (3) other);

(G) Torture/Depravity without A–F above;

(H) Abduction without A–G above;

(I) Arson without A–H above;

(J) Escape Detection without A–I above;

(K) Burglary without A–J above;

(L) Grave Risk without A–K above;

(M) Victim Under 14 Years Old without A–L above.

[*Harris II, supra,* 165 *N.J.* at 316, 757 *A.*2d 221.]

Category D includes defendants who commit murders involving a sexual assault. The Attorney General and Public Defender concur that defendant should be assigned to D–1, a subcategory of D. Subcategory D–1 comprises defendants who have committed sexual-assault murders with "particular violence or terror." *Proportionality Review I, supra,* 161 *N.J.* at 88, 735 *A.*2d 528. "Generally, [those] cases . . . include murders that involve multiple wounds from a gun, knife or physical beating, murders that involve mutilation or wounds intended to cause pain, and murders involving a minor victim." *Harris II, supra,* 165 *N.J.* at 317, 757 *A.*2d 221. The D–2 subcategory consists of "non-aggravated" sexual-assault murders. *Id.* at 316–17, 757 *A.*2d 221. A threshold question concerns whether we should in this case consolidate the D–1 and D–2 subcategories.

In *Harris II,* this Court consolidated the D–1 and D–2 subcategories for proportionality analysis. *Id.* at 317–19, 757 *A.*2d 221. The original rationale for the distinction was that "juries and prosecutors tended to view [D–1] defendants as more deathworthy" than a "simple" sexual-assault-murder defendant. *Harris II, supra,* 165 *N.J.* at 317, 757 *A.*2d 221 (citing *Proportionality Review I, supra,* 161 *N.J.* at 88, 735 *A.*2d 528). Nevertheless, *Harris II* states:

Trying to create objective criteria that *consistently* distinguish among sexual assault murders on the basis of the degree of particular violence and terror is problematic. Cases of this nature inherently involve subjective factors, particularly when the determinative linedrawing is supposed to focus on *"particular violence or terror."*

[*Harris II, supra,* 165 *N.J.* at 318, 757 *A.*2d 221.]

*Harris II* concluded that "consolidation of the entire D category offers a more appropriate sampling of cases like defendant's to assess deathworthiness." *Id.* at 319, 757 *A.*2d 221.

We agree that we should consolidate the categories in this case as well. D–2 cases simply may not be substantially less deathworthy than D–1 cases. As *Harris II* noted, "the D–2 category has so

few cases with which to compare [a] defendant." *Id.* at 318–19, 757 *A.*2d 221. At present, fifty-nine cases fall within the composite D category; forty-seven cases comprise subcategory D–1; and twelve cases comprise subcategory D–2.

█ We now compare defendant's case to similar cases within the entire D category. We first conduct frequency analysis, and then we apply precedent-seeking review. *State v. Feaster,* 165 *N.J.* 388, 398, 757 *A.*2d 266 (2000) (*Feaster II*); *State v. Morton,* 165 *N.J.* 235, 244, 757 *A.*2d 184 (2000) (*Morton II*); *Cooper II, supra,* 159 *N.J.* at 70, 731 *A.*2d 1000; *Proportionality Review I, supra,* 161 *N.J.* at 77, 735 *A.*2d 528. As we explained in *Cooper II:*

> [F]irst, we use a frequency analysis that includes both mathematical and statistical calculations to compare defendant's case to other cases with similar fact patterns or similar levels of culpability in order to ascertain the rate of death sentencing in those similar cases; second, we engage in precedent-seeking review in which we compare all relevant factors in factually similar cases to determine whether *defendant's death sentence appears to be disproportionate in comparison to the* sentences imposed on other defendants who committed comparable homicides.
>
> [*Id.* at 70, 731 *A.*2d 1000.]

We begin with frequency analysis.

## B. *FREQUENCY ANALYSIS*

█ At one point, frequency analysis required application of three tests, the salient-factors test, the numerical preponderance test, and the index-of-outcomes test. Within the past two years, we abandoned some of that arcana by eliminating both the index-of-outcomes test and the numerical preponderance test due to inherent flaws in each approach. *Proportionality Review I, supra,* 161 *N.J.* at 87, 91–92, 735 *A.*2d 528 (adopting Judge Baime's recommendation and abandoning index-of-outcomes test); *State v. Loftin,* 157 *N.J.* 253, 295, 724 *A.*2d 129 (*Loftin II*) (abandoning numerical preponderance test), *cert. denied,* 528 *U.S.* 897, 120 *S.Ct.* 229, 145 *L.Ed.*2d 193 (1999). Frequency analysis thus consists exclusively of the salient-factors test. As we described in *Martini II:*

> The salient-factors test allows us to measure the relative frequency of a defendant's sentence by comparing it to sentences in factually-similar cases. Its purpose is to help us determine whether the death sentence is imposed in a category of comparable cases often enough to create confidence in the existence of a societal consensus that death is the appropriate remedy.
>
> [*Martini II, supra,* 139 *N.J.* at 33, 651 A.2d 949.]

Thus, the objective is to determine whether the frequency of death sentences in similar cases involving defendants with similar culpability supports a determination that the death penalty in the case before us is or is not aberrational. *Chew II, supra,* 159 *N.J.* at 201–02, 731 *A.*2d 1070. The process compares a defendant's culpability with that of other death-eligible defendants. We measure the relative frequency of a defendant's sentence by determining the rate at which factually-similar cases culminate in a death sentence. *Id.* at 202, 731 *A.*2d 1070. The salient-factors test, demystified, is largely deductive, involving a simple "if-then" method of reasoning. If, in similar cases, the ratio of death sentences to penalty-trial cases or the ratio of death sentences to death-eligible cases is high, then the Court may interpret the relatively high rate of death sentencing as "strong evidence of the reliability of [the] defendant's death sentence." *State v. Bey,* 137 *N.J.* 334, 358, 645 *A.*2d 685 (1994) (*Bey IV*), *cert. denied,* 513 *U.S.* 1164, 115 *S.Ct.* 1131, 130 *L.Ed.*2d 1093 (1995). As noted, we have assigned defendant to the consolidated D category. We now examine the death-sentencing rates among the penalty-trial and death-eligible cases within that category.

Notwithstanding the consolidation of the D–1 and D–2 categories, the following chart demonstrates that, whether we use the D category or the D–1 subcategory, defendant's death sentence is not aberrational. We examine the relevant data under both alternatives.

| | CASES THAT ADVANCED TO PENALTY TRIAL | PENALTY-TRIAL RESULTED IN DEATH SENTENCE | DEATH SENTENCING RATE IN ALL DEATH-ELIGIBLE CASES |
|---|---|---|---|
| **D. Sexual Assault** | | | |
| 59 Death-Eligible Cases | 44% (26/59) | 35% (9/26) | 15% (9/59) |
| Exclude Defendant | 43% (25/58) | 32% (8/25) | 14% (8/58) |
| **D-1. Aggravated Sexual Assault** | | | |
| 47 Death-Eligible Cases | 49% (23/47) | 35% (8/23) | 17% (8/47) |
| Exclude Defendant | 48% (22/46) | 32% (7/22) | 15% (7/46) |
| **All Death-Eligible Cases** | | | |
| 455 Death-Eligible Cases | 39% (176/455) | 30% (52/176) | 11% (52/455) |
| Exclude Defendant | 39% (175/454) | 29% (51/175) | 11% (51/454) |

A greater percentage of D category defendants advanced to penalty trial, received the death sentence after a penalty trial, and received the death sentence overall, than did all death-eligible defendants. Excluding defendant leads to the same result. Thus, those statistics do not support defendant's contention that his death sentence is an aberration, as they did not support Ambrose Harris's recent disproportionality claim based on the same statistics. *Harris II, supra*, 165 *N.J.* at 319–20, 757 *A.*2d 221. Neither do the D–1 statistics, had we not combined the D subcategories, demonstrate disproportionality. D–1 defendants advanced to penalty trial and received the death sentence at a greater rate than all death-eligible defendants. When defendant is excluded, the D–1 rates still exceed the rates for all death-eligible defendants. Thus, neither the composite D category nor the D–1 subcategory statistics support defendant's claim of disproportionality.

■ The results of the salient-factors test demonstrate that prosecutors and juries consider sexual-assault murders more deathworthy than other death-eligible homicides. However, because there is not a dramatic difference between death-sentencing rates in D and D–1 homicides and other death-eligible homicides, we must "give enhanced weight to the process of precedent-seeking review." *Cooper II, supra*, 159 *N.J.* at 88, 731 *A.*2d 1000.

## C. PRECEDENT-SEEKING REVIEW

 In precedent-seeking review "we examine death-eligible cases similar to defendant's case to determine whether his death sentence is aberrant when compared to the sentences received by defendants in those other cases." *Chew II, supra,* 159 *N.J.* at 210, 731 *A.*2d 1070. This is "the traditional, case-by-case form of review in which we compare similar death-eligible cases." *Martini II, supra,* 139 *N.J.* at 46, 651 *A.*2d 949.

> Through this method we determine whether a defendant's criminal culpability exceeds that of similar life-sentenced defendants and whether it is equal to or greater than that of other death sentenced defendants, such that the defendant's culpability justifies the capital sentence; or whether a defendant's culpability is more like that of similar life-sentenced defendants and less than that of death-sentenced defendants, such that the defendant's culpability requires a reduction of sentence to a life term. We note that statutory proportionality does not require identical verdicts even in closely-similar cases. It merely requires that the defendant was not singled out unfairly for capital punishment.
>
> [*Id.* at 47, 651 *A.*2d 949 (citations omitted).]

"[T]he process of precedent-seeking review is one familiar to us as judges and is not vulnerable to the concerns about reliability that burden frequency analysis." *Cooper II, supra,* 159 *N.J.* at 70, 731 *A.*2d 1000. "We have consistently placed our reliance on this form of review because of the analytic difficulties we have encountered in applying frequency analysis." *Loftin II, supra,* 157 *N.J.* at 296, 724 *A.*2d 129. Precedent-seeking review is less empirical and more analytical than frequency analysis. The exercise is more inductive, less formulaic.

### 1. RELEVANT FACTORS

 In precedent-seeking review, we first examine the criminal culpability of the defendant. Criminal culpability, in turn, has three components: the moral blameworthiness of the defendant, the degree of victimization, and the character of the defendant. *Chew II, supra,* 159 *N.J.* at 210, 731 *A.*2d 1070; *Martini II, supra,* 139 *N.J.* at 48–49, 651 *A.*2d 949; *Marshall II, supra,* 130 *N.J.* at 155, 613 *A.*2d 1059.

### a. Defendant's Moral Blameworthiness

■ Blameworthiness requires consideration of "motive, premeditation, justification or excuse, evidence of mental defect or disturbance, knowledge of helplessness of the victim, defendant's age or maturity level, and defendant's involvement in planning the murder." *Loftin II, supra,* 157 *N.J.* at 336, 724 *A.*2d 129. We conclude, upon an application of the above factors, that the moral blameworthiness of defendant is high.

Although we have not described the graphic details of this sexual-assault murder, defendant's conduct can, as noted, fairly be described as "horrific." *Timmendequas I, supra,* 161 *N.J.* at 650, 737 *A.*2d 55 (Handler, J., dissenting). That he knew seven-year-old Megan was helpless aggravates his moral blameworthiness substantially. See *Cooper II, supra,* 159 *N.J.* at 90, 731 *A.*2d 1000 (finding defendant's knowledge of the rape-murder victim's youth aggravating). Defendant also lured Megan into his house by letting her play with his puppy. Defendant's motive, that he strangled Megan because of his fear that she would reveal the sexual assault, is highly blameworthy. *Harris II, supra,* 165 *N.J.* at 322, 757 *A.*2d 221 (finding motive to escape detection increased moral blameworthiness); *Harvey III, supra,* 159 *N.J.* at 312–13, 731 *A.*2d 1121 (same). Defendant's participation in the search and lying to police also aggravate his blameworthiness.

■ Although the effect of the murder on the victim's family has not received extended discussion, *Chew II, Morton II,* and *Harvey III* consider that element during precedent-seeking review. *Morton II, supra,* 165 *N.J.* at 251, 757 *A.*2d 184 (considering, during analysis of moral blameworthiness, defendant's knowledge of effect of murder on victim's surviving family); *Chew II, supra,* 159 *N.J.* at 212–13, 731 *A.*2d 1070 (same); *Harvey III, supra,* 159 *N.J.* at 313, 731 *A.*2d 1121 (same). *See also Feaster II, supra,* 165 *N.J.* at 406, 757 *A.*2d 266 (considering, during analysis of victimization, whether evidence was adduced regarding impact of murder on victim's family). Those cases make clear that the effect of the murder on the victim's family is a proper consider-

ation during moral blameworthiness analysis. We note, as the dissent suggests, that the effect of the murder on the victim's family is likely present in the vast majority of the comparison cases, which reduces the factor's significance substantially. That factor nonetheless exists here. Megan's parents and siblings must live each day with the ache of her absence and their awareness of the terror she endured in the final moments of her life, which also aggravates defendant's moral blameworthiness.

Defendant was thirty-three years old at the time of the murder. As in *Harris II*, "there is nothing mitigating about defendant's age or level of maturity at the time of the murder. He was ... old enough to know right from wrong." *Harris II, supra*, 165 *N.J.* at 324, 757 *A.*2d 221.

Defendant did offer proof that he had suffered from emotional deficits and a highly abusive childhood, which reduce his moral blameworthiness. Yet, as we found in *Harris II*, "[d]espite this poor childhood and resulting debilitating effects on defendant, the evidence was not persuasive that defendant should be relieved of his culpability." *Ibid.*

Timmendequas murdered a seven-year-old child, Megan Kanka, and did so to escape detection for his sexual assault. The fact that he was a pedophile does not excuse his conduct. His moral blameworthiness is therefore high.

### b. *Degree of Victimization*

██ Victimization concerns the relative violence and brutality of the murder. *Harvey III, supra*, 159 *N.J.* at 313–14, 731 *A.*2d 1121. We also examine "injury to non-decedent victims." *Chew II, supra*, 159 *N.J.* at 211, 731 *A.*2d 1070. The level of victimization was exceptional in this case, given the violence and brutality of the murder. The victimization is similar to that described in *Cooper II*:

> The extent of victimization in defendant's case is extremely high. Defendant kidnapped, raped, and strangled his six-year-old victim. The record indicates that there was neither torture ... nor mutilation of the victim. The incident was relatively brief, but there was evidence that defendant choked the victim for four to

six minutes. Although her suffering was not prolonged, the victim undoubtedly was terrified and obviously suffered physically and emotionally before her death. [*Cooper II, supra,* 159 *N.J.* at 91, 731 *A.*2d 1000.]

Although defendant concedes that victimization is high, he asserts that it is not as high as it could have been because Megan's pain "was not prolonged." For Megan, however, those moments of suffering likely seemed an eternity. Coupled with the sexual assault that preceded the fatal strangulation, as well as the terror and fright that Megan endured, the victimization is extremely high.

### c. *Character of Defendant*

The final consideration in determining overall culpability, defendant's character, is a catchall category that warrants consideration of "defendant's prior criminal history, unrelated acts of violence, cooperation with authorities, remorse and capacity for rehabilitation." *Feaster II, supra,* 165 *N.J.* at 406, 757 *A.*2d 266; *see also Chew II, supra,* 159 *N.J.* at 211, 731 *A.*2d 1070; *Bey IV, supra,* 137 *N.J.* at 366, 645 *A.*2d 685. Those factors substantially augment defendant's blameworthiness.

Defendant's criminal record reflects both a 1980 conviction for attempted aggravated sexual contact and a 1982 conviction for sexual assault and aggravated assault. That criminal record increases his culpability. *Harvey III, supra,* 159 *N.J.* at 314–15, 731 *A.*2d 1121. Defendant acknowledges that his pedophilic urges prevent rehabilitation. Finally, his deceit in connection with the investigation, particularly his distribution of the photos of Megan during the search for her whereabouts, compounds the felony, in both a literal and figurative sense.

It is true that certain factors mitigate. Timmendequas's first confession exhibited some remorse, as evidenced by his statement that he felt guilty when he observed Megan's parents and neighbors searching for her. In his allocution, he expressed further remorse. There was also some evidence of cooperation. Defendant's evasion and lies, however, minimize the value of cooperation as a mitigating factor. He omitted significant details from his

first statement. It appears that the autopsy results, rather than any pang of conscience, prompted a more complete confession. During the confession, defendant also blamed Megan for biting his hand and causing him pain. Notably, the jury unanimously rejected a proposed mitigating factor that his "cooperation" demonstrated the acceptance of responsibility.

After a careful consideration of his moral blameworthiness, the degree of victimization of Megan and her family, and defendant's character, we conclude that defendant is highly deathworthy.

### 2. CASE COMPARISONS

We review the comparison cases to determine if those similarly culpable to or more culpable than defendant generally receive life sentences rather than death sentences. *See Chew II, supra,* 159 *N.J.* at 210, 731 *A.*2d 1070. Such a finding would support a claim of disproportionality, because it would provide evidence of a societal consensus that the death penalty is not imposed in cases similar to this one. We consider each comparison defendant's motive, premeditation, justification or excuse, evidence of mental disease, defect, or disturbance, knowledge of the victim's helplessness, knowledge of the effects on nondecedent victims, age, involvement in planning the murder, violence and brutality of the murder, injury to nondecedent victims, prior record, other unrelated acts of violence, cooperation with authorities, remorse, and capacity for rehabilitation. *Marshall II, supra,* 130 *N.J.* at 155, 613 *A.*2d 1059. With regard to the actual mechanics, we analyze each case to determine if defendant is more or less deathworthy than the comparison defendant. If defendant is less deathworthy than a life-sentenced defendant, that conclusion supports defendant's claim of disproportionality. If, however, defendant is more deathworthy than a life-sentenced defendant, that detracts from defendant's claim. After we compare defendant to all of the comparison cases, we determine if the results demonstrate that cases more deathworthy than defendant's gener-

ally receive life sentences, which would strongly indicate disproportionality.

The parties have agreed upon fourteen comparison cases. We base our discussion of the comparison cases on the AOC records of those cases, which are summarized in Appendix A. In our discussion of the cases, we omit reference to irrelevant factors.

### a. *Agreed Upon Cases*

We first address cases in which the comparison defendants have been sentenced to death, in order to determine if defendant is more or less culpable than those defendants.

### 1) *Death Sentences*

Defendant is more culpable than David Cooper, whose death sentence was not disproportionate. *Cooper II, supra,* 159 *N.J.* at 116, 731 *A.*2d 1000. Defendant and Cooper both sexually assaulted and strangled a young girl, and denied involvement until police confronted them with the evidence against them. Both had mothers who drank heavily during pregnancy, and both had abusive and unstable childhoods. There were some contrasts between defendant and Cooper. Cooper was an alcoholic who claimed to have been drunk during the murder; however, he presented no evidence of his alleged intoxication at trial. Although Cooper was on parole at the time of the murder, he had no prior violent or sexual offenses. Defendant presented evidence demonstrating that he was sexually abused as a child and diagnosed as a pedophile as an adult. In addition, defendant was a prior sex offender. On balance, defendant's prior record renders him slightly more deathworthy than Cooper. Therefore, Cooper's death sentence weakens defendant's disproportionality claim.

 Turning to the other death-sentenced case, the victimization in Joseph Harris's revenge killing was significant. Not only did Harris sexually assault Ron Ellison's wife and two young daughters, causing incredible victimization to them, he did so while Ellison was tied up, powerless to stop the attacks. Furthermore, Ellison feared for his life before Harris shot him. Harris

heard voices and was diagnosed as a schizoid and with inadequate personality disorder, but his jury rejected the proposed c(5)(a) (extreme emotional disturbance) and c(5)(d) (diminished capacity) mitigating factors. Based on the additional victimization, Harris is more deathworthy than defendant. The dissent agrees, and concludes that Harris's death sentence supports defendant's claim of disproportionality. *Post* at 85, 773 *A.*2d at 56. We also reach that conclusion, but to a lesser degree than the dissent. The dissent's thesis is that because we reserve the death penalty for the most heinous cases, and Harris is more deathworthy than defendant (and therefore his case more heinous), Harris's case is appropriate for the death penalty and defendant's is not. That approach misapplies concepts of proportionality review. Two defendants, both sentenced to death, may have different degrees of culpability. Proportionality review is not undertaken to ensure that those two defendants are similarly deathworthy. Its purpose is instead to ensure that one defendant's death sentence is not aberrational when compared to other similar defendants. *See Harvey III, supra,* 159 *N.J.* at 319, 731 *A.*2d 1121 ("Proportionality review seeks only to assure that defendant's sentence is not an aberration. It is not intended to ensure that one killer's sentence is identical to all other similarly categorized killers.") (citation omitted). Even if Timmendequas is the least deathworthy of the death-sentenced defendants, we must affirm provided his death penalty is not aberrational.

Moreover, little can be inferred from Harris's death sentence. Harris's sentence indicates that the jury found his case sufficiently serious to warrant the imposition of the death penalty. Harris's sentence does not, however, create any necessary inference about whether defendant's case is sufficiently serious to warrant that penalty as well. The most that can be said is that in light of defendant's lesser deathworthiness, imposition of the death sentence on defendant may have been somewhat less likely than it was for Harris. To that extent, we agree with the dissent. That vague notion, however, does not provide substantial support for defendant's claim of disproportionality.

## 2) *Life Sentences*

The bulk of the comparison cases resulted in life sentences. Thus, if defendant is less culpable than the defendants in most of those cases, he has arguably demonstrated that his death sentence was an aberration. If he is more culpable than most of those cases, his disproportionality claim is diminished.

The case of Vincent Brown is similar to defendant. Brown sexually assaulted a young girl and strangled her to death. He confessed to sexual assault and murder after unsuccessfully attempting to deceive the police. Brown's criminal record included violent offenses. During his youth, he was physically and sexually abused. In one respect, Brown is more culpable than defendant: Brown left his victim to die in a ditch as she screamed for help. Nevertheless, defendant is more deathworthy than Brown. Unlike defendant, Brown did not penetrate his victim. In addition, Brown suffered from major depression with psychotic features and was declared incompetent to stand trial.

On the other hand, Jerome Dennis's life sentence supports defendant's disproportionality claim. Dennis stabbed a fourteen-year–old girl twenty-four times and raped her. Although his victim was less vulnerable than Megan and he did not kill to avoid apprehension, Dennis's murder entailed more victimization than defendant's murder. Dennis, a prior sex offender, committed murder two weeks after he was released on parole. He killed four more people in the following four months. Moreover, there is no indication that Dennis was sexually abused or suffered from any mental illnesses. The substantial victimization, Dennis's prior record, and the lack of mitigating evidence make him more deathworthy than defendant.

Ralph Edwards's victim was nearly as vulnerable as Megan. Like defendant, Edwards had a history of psychological illness, and his jury found the c(5)(d) (diminished capacity) mitigating factor. However, no juror in Edwards's case found the c(5)(a) (extreme emotional disturbance) mitigating factor. In contrast to defendant, Edwards was only eighteen years old and had no prior

criminal record. Those factors render defendant more deathworthy than Edwards.

James Henderson and Gary Lippen caused extraordinary victimization. Henderson raped the victim while Lippen held her down, and Lippen may have also raped her. They crushed her throat with a stick, and Henderson stabbed her several times and broke her legs. Henderson had a history of mental illness. There is no indication that Henderson had an abusive childhood or that he expressed remorse for what he had done. Henderson's case included mitigating evidence not present in defendant's case: Henderson was illiterate, and apparently had only one drug conviction in his prior record. Henderson also did not kill to escape detection for the rape. Moreover, the seventeen-year-old victim in that case was not nearly as vulnerable as Megan; however, Henderson and Lippen neutralized the victim's ability to resist the rape when Lippen held her down while Henderson raped her. Overall, Henderson and defendant are similarly deathworthy.

In contrast, Lippen is less culpable than defendant. Lippen claimed that his participation in the murder was due to his fear of Henderson. That situation is distinct from *Morton II,* in which we held that a defendant's culpability "should not be diminished" because a co-defendant primarily planned the crime when the defendant "willingly participated." *Morton II, supra,* 165 *N.J.* at 252, 757 *A.*2d 184. Lippen's allegation was that he participated in the crime because he feared Henderson. He did not "willingly" participate, contrary to the dissent's suggestion. *Post* at 87, 773 *A.*2d at 57. In addition, Lippen may have been intoxicated, did not kill to escape detection, had no prior convictions, and was only nineteen years old. Although he did not have a history of mental illness, Lippen is less deathworthy than defendant.

Michael Manfredonia inflicted gratuitous pain on his fourteen-year-old victim whom he stabbed twenty-six times and sexually assaulted. The victimization in Manfredonia's case was substan-

tial, as his victim suffered more than Megan. The c(5)(d) (diminished capacity) mitigating factor was not present in Manfredonia's case. Like defendant, Manfredonia was extremely emotionally disturbed and had borderline intelligence. In addition, he was nineteen years old and suicidal, had no prior record except for a disorderly persons theft offense, and allegedly felt provoked by the victim's verbal insults. Also, the victim was seven years older than Megan. Manfredonia's and defendant's culpability are comparable.

The similarities between the rape-murders Rasheed Muhammad and defendant committed are striking. They both kidnapped, sexually assaulted, and lethally strangled young girls. As children, both Muhammad and defendant were physically and sexually abused, neglected, and raised in homes replete with violence. Muhammad did not attempt to establish the c(5)(a) (extreme emotional disturbance) and c(5)(d) (diminished capacity) mitigating factors; however, pursuant to the c(5)(h) (catchall) factor, the jury found that Muhammad was emotionally unstable and had twice attempted suicide. Muhammad's jury rejected the c(4)(f) (escape detection) aggravating factor. Muhammad's prior record included property-crime convictions, but no sexual or other violent offenses. Furthermore, it appears that Muhammad confessed without attempting to outwit the police and the victim's family by giving a false statement to the police or feigning assistance with searching for the victim. Therefore, defendant is slightly more deathworthy than Muhammad.

Defendant is also more culpable than Frederick Ritchie. Evidence of Ritchie's intent to kill his twelve-year-old victim was disputed; no direct evidence contradicted Ritchie's claim that the drunken victim accidentally fell into a washing machine and walked into a tree and that the impact of colliding with the tree caused him to fall into a creek. The strength of the evidence may have induced the prosecutor to plea bargain for an aggravated manslaughter conviction. *Cooper II, supra*, 159 *N.J.* at 100, 731 *A.*2d 1000. In addition, Ritchie's victimization was not as great as

in this case. Furthermore, Ritchie was a veteran who suffered from Crohn's disease and alcoholism. Ritchie drank while committing the crimes, and demonstrated, to some extent, diminished capacity. Ritchie's prior record included a burglary as well as sex crimes. Based on those factors, Ritchie is less deathworthy than defendant.

Apparently to exact revenge from his girlfriend who was having an affair with another man, Leroy Taylor sexually assaulted and strangled to death her thirteen-year-old niece. Although Taylor did not kill to avoid apprehension for the sexual assault, his revenge motive is as morally blameworthy as defendant's escape-detection motive. Taylor previously murdered a four-year-old girl in California; however, he was a juvenile when he committed the prior murder. Taylor was on parole when he committed the New Jersey murder. Taylor refused to cooperate with police, fleeing to California when New Jersey authorities sought blood and hair samples. There is no indication that Taylor was abused or emotionally disturbed. Taylor is more deathworthy than defendant, based on his prior murder and lesser mitigating evidence. Thus, Taylor's life sentence buttresses defendant's claim that his death sentence is disproportionate.

As in defendant's case, the c(5)(a) (extreme emotional disturbance) and c(5)(d) (diminished capacity) mitigating factors were present in Alphonso Timpson's case. Like defendant, Timpson had borderline intelligence. Although Timpson was not diagnosed as a pedophile, he had similar characteristics as defendant: Timpson was diagnosed as highly impulsive and unable to exhibit emotional control. Moreover, Timpson drank excessively and smoked marijuana on a daily basis. He was only nineteen years old. Like defendant, Timpson denied killing the victim before eventually confessing to the kidnapping, sexual assault, and murder. However, Timpson did not pretend to help search for the victim after killing her. In contrast to defendant, Timpson inflicted gratuitous violence on his victim. Primarily due to Timpson's age, he is less deathworthy than defendant.

Defendant is significantly more culpable than Mark Luciana. Luciana's case involved less victimization, and his fifteen-year-old victim, who was less vulnerable than Megan, willingly accompanied Luciana into the woods. Like defendant, Luciana was neglected as a child. In both cases, the juries found the c(5)(d) (diminished capacity) mitigating factor. However, Luciana was only twenty years old and had no violent prior criminal convictions. Consequently, Luciana's life sentence does not support defendant's disproportionality claim.

Likewise, Lester Wilson's life sentence does not suggest disproportionality. His victim was twice Megan's age, and Wilson victimized her less than defendant victimized Megan. Moreover, Wilson was mildly mentally retarded and had no criminal record. That evidence demonstrates that he is less deathworthy than defendant.

The agreed-upon comparison cases, both life- and death-sentenced defendants, do not support defendant's claims of disproportionality. Defendant is more culpable than David Cooper, whose death sentence was held not disproportionate. *Cooper II, supra,* 159 *N.J.* at 116, 731 *A.*2d 1000. That undercuts his claim of disproportionality, as it supports the notion that there is a consensus that murderers as culpable as defendant and Cooper deserve the death penalty. Defendant is also more culpable than Vincent Brown, Ralph Edwards, Rasheed Muhammad, Frederick Ritchie, Alphonso Timpson, Mark Luciana, Gary Lippen, and Lester Wilson. Thus, those defendants' life sentences do not bolster defendant's disproportionality claim. Although defendant is equally as culpable or less culpable than Dennis, Henderson, and Taylor, those three cases are not sufficient to demonstrate a societal consensus that murderers like defendant generally receive a life sentence.

### b. *Contested Cases*

■ Defendant also proposes ten additional comparison cases. The Attorney General objects to their inclusion. We must determine whether each case is sufficiently similar to defendant's case

to include them within the comparison group. *Morton II, supra,* 165 *N.J.* at 256, 757 *A.*2d 184. We presume that cases not in defendant's combined D category are outside of his comparison group. *Ibid.* Conversely, we presume that cases in defendant's salient-factor category fall within his comparison group. *Ibid.*

Other than the common salient factor, Kevin Conley's rape-murder shares one substantial characteristic with defendant's crime: both victims were vulnerable because of their age. Thus, Conley's case falls within defendant's comparison group. Because Conley not only beat and stabbed his victim, but sexually assault-ed and strangled her to death as well, Conley inflicted more victimization than defendant. In addition, Conley's case presented no evidence of child abuse or mental illness. On the other hand, Conley had a college degree, was an Army Reservist, and had no prior criminal record. Furthermore, Conley did not kill to avoid apprehension or feign assistance with a rescue effort. Conley and defendant are similarly culpable.

Like Conley, Frank Masini's rape-murders of elderly women fall within defendant's comparison group. Masini's deathworthiness exceeds defendant's. Masini stabbed four elderly people to death, and raped two of them, both of whom were his relatives. Despite Masini's lack of a prior record or escape-detection motive, and the detachments from reality that he experienced at the time of the murders, the number of victims Masini murdered renders him more culpable than defendant. Accordingly, Masini's life sen-tences augment defendant's disproportionality claim.

Samuel Mincey's robbery-rape-murder should fall within defen-dant's comparison group because of his seventy-three-year-old victim's age-related vulnerability. However, she was less vulnera-ble than Megan and, thus, Mincey is less morally blameworthy in that regard. In contrast, Mincey's crime involved more victimiza-tion, and there were elements of torture in Mincey's case. Min-cey's extensive prior record includes violent offenses, but not sex crimes. There is also no indication that Mincey was abused or emotionally disturbed. Mincey is roughly as culpable as defen-

dant. Nevertheless, the prosecutor did not seek a death sentence against Mincey because of an erroneous belief that the statute of limitations for seeking a death sentence had passed. That constitutes a valid basis for the discrepancy between Mincey's life sentence and defendant's death sentence. *Cooper II, supra,* 159 *N.J.* at 100–01, 107, 731 *A.*2d 1000. Thus, Mincey's life sentence does not buttress defendant's disproportionality claim.

Rafael Rivera's sexual-assault murder of a seventy-eight-year-old woman belongs in defendant's comparison group because of the victim's age-related vulnerability. Nonetheless, Rivera's victim was not as vulnerable as Megan. Rivera's assault, sexual assault, and murder were not premeditated; he surprised the victim when she returned to her apartment while he was there looking for money. However, Rivera attacked the victim when she found him and caused extreme victimization; indeed, the jury found the c(4)(c) (torture or depravity) aggravating factor. Rivera's prior record includes theft offenses and a weapons-possession conviction, but no prior sexual or other violent crimes. Rivera abused alcohol, marijuana, and cocaine, and was seen drunk shortly before the murder. The jury found the c(5)(d) (diminished capacity) mitigating factor, presumably because of Rivera's intoxication. Rivera apparently presented no evidence of child abuse or mental illness. The enhanced victimization in Rivera's case counterbalances Megan's greater vulnerability, but defendant's more extensive prior criminal record offsets Rivera's lack of abuse or mental illness. However, Rivera was intoxicated when committing his crimes. Thus, defendant is more deathworthy than Rivera.

Otis James's life sentence does not suggest disproportionality, as James is less deathworthy than defendant. Although James had several convictions in his record and subsequently attempted another murder, his mitigating evidence exceeds defendant's. James had a history of depression and once was hospitalized after attempting suicide. Thus, James's mental mitigating evidence is nearly as strong as defendant's, despite having no history of

abuse. Further, James also had no prior sex offenses, his victim was not as vulnerable as Megan, and he was intoxicated when he committed the crime. Thus, James is less deathworthy than defendant, and his life sentence does not support defendant's claim.

Carlos Vasquez's case is sufficiently similar to defendant's case. Both involve a rape and strangulation of a child under fourteen years old. Vasquez, who pled guilty to felony murder and received a life sentence, is more culpable than defendant. Although Vasquez's thirteen-year-old victim was less vulnerable than Megan, Vasquez was a prior murderer. Vasquez denied having mental health problems, and there is no indication that he endured an abusive childhood. Therefore, Vasquez's life sentence supports defendant's claim of disproportionality.

The remaining cases that defendant seeks to add to his comparison group are dissimilar. As discussed, we presume that cases outside of defendant's category are excluded from his comparison group. *Morton II, supra,* 165 *N.J.* at 256, 757 *A.*2d 184. Daniel Nicini's, Kevin Aquino's, and Kenneth Querns's cases are not sufficiently similar to overcome that presumption. Nicini did not commit any sex crimes contemporaneous with the murder. Despite intending to sexually assault the six-year-old victim when he burglarized her home, Aquino did not attempt any sex crimes during the incident. The evidence suggesting that Kenneth Querns sexually assaulted the nine-year-old victim was weak. The State did not allege that Querns raped the victim; instead, the State contended, based on the fact that the victim was found without underwear, that Querns fondled her. Querns did not plead guilty to any sex crimes. Thus, there is insufficient evidence that Querns committed a contemporaneous sexual assault to render his case sufficiently similar to defendant's and justify inclusion.

\* \* \*

The critical question here is whether defendant's deathworthiness is more akin to life-sentenced defendants or death-

sentenced defendants. Joseph Harris is substantially more death-worthy than defendant. Thus, Harris's case provides little support for defendant's disproportionality claim. Further, defendant is more culpable than David Cooper. We have previously concluded that Cooper's death sentence was not disproportionate, *Cooper II, supra,* 159 *N.J.* at 116, 731 *A.*2d 1000, which especially weakens defendant's claim of disproportionality.

When compared to life-sentenced defendants, defendant is more culpable than Vincent Brown, Ralph Edwards, Gary Lippen, Rasheed Muhammad, Frederick Ritchie, Alphonso Timpson, Mark Luciana, Lester Wilson, Rafael Rivera, and Otis James. Although defendant seems no more culpable than Samuel Mincey, other factors explain the sentencing disparity.

On the other hand, defendant is no more deathworthy than Jerome Dennis, James Henderson, Michael Manfredonia, Leroy Taylor, Frank Masini, Kevin Conley, and Carlos Vasquez. Defendant's death sentence, compared to those life sentences, is arguably disparate. However, "[d]isparity alone does not demonstrate disproportionality." *Bey IV, supra,* 137 *N.J.* at 386, 645 *A.*2d 685. "Proportionality review seeks only to assure that defendant's sentence is not an aberration. It is not intended to ensure that one killer's sentence is identical to all other similarly categorized killers." *Harvey III, supra,* 159 *N.J.* at 319, 731 *A.*2d 1121 (citation omitted); *accord Cooper II, supra,* 159 *N.J.* at 115, 731 *A.*2d 1000; *Bey IV, supra,* 137 *N.J.* at 352, 645 *A.*2d 685. The fact that defendant is more culpable than the bulk of the defendants in his comparison group demonstrates that his death sentence is not an aberration. Moreover, our affirmance of Cooper's death sentence significantly undermines defendant's claim.

Application of the relevant tests to the circumstances of this case demonstrates that the death penalty imposed on Jesse Timmendequas for the sexual-assault murder of Megan Kanka was not aberrational.

## III. OTHER ARGUMENTS

Defendant raises the same systemic disproportionality claims, with the same evidentiary basis, that we rejected last term in *Harris II, supra,* 165 *N.J.* at 344–45, 757 *A.*2d 221, *Feaster II, supra,* 165 *N.J.* at 419–20, 757 *A.*2d 266, and *Morton II, supra,* 165 *N.J.* at 267–70, 757 *A.*2d 184. Because defendant has provided no new evidence, we do not revisit those rulings. We also reject defendant's request that we reconsider our holding in *Harris II, supra,* 165 *N.J.* at 343, 757 *A.*2d 221, regarding the implications of pretrial publicity during proportionality review. Defendant has presented no compelling grounds to do so.

## IV. CONCLUSION

The results of proportionality review may not obtain with syllogistic precision. The Court recently observed that "[t]he improvements and additions we approve today will need further review down the road." *In re Proportionality Project (II),* 165 *N.J.* 206, 213, 757 *A.*2d 168 (2000). Nevertheless, we are confident that both the frequency and precedent analyses remain workable guides as we determine, on a case-by-case basis, whether a death sentence is disproportional. The continuing "process of litigating elucidation," *International Ass'n of Machinists v. Gonzales,* 356 *U.S.* 617, 619, 78 *S.Ct.* 923, 924, 2 *L.Ed.*2d 1018, 1021 (1958) (Frankfurter, J.), basic to all jurisprudence, will serve to further define and refine those standards. It is an evolving process and, as with any evolution, those tests most fit will survive.

For the present, principles of proportionality review reflect and preserve a capital jurisprudence that is fair and just to all parties. That review satisfies us that the death sentence imposed upon Jesse K. Timmendequas for the sexual-assault murder of Megan Kanka was not disproportionate.

Affirmed.

## APPENDIX A

### I. *Agreed–Upon Cases*

#### A. *Vincent Brown*

Brown and his girlfriend argued, and she moved out of the motel room they shared. Brown began drinking vodka and using cocaine. The victim, the girlfriend's ten-year-old niece, went to the motel room, not knowing that her aunt had moved out. Brown invited her in. He forced her to get on the bed and pull down her pants and panties. He placed his penis against her vagina, and the victim cried and resisted him. He stopped and began to masturbate while she sat next to him. They subsequently left the room, and the victim ran away. As she ran, she yelled that she was going to tell her mother about the sexual assault. Brown chased and caught her. He strangled her until she began foaming at the mouth two or three minutes later. He left her in a ditch, screaming for help, where she died. After initially denying involvement, he later confessed to the crime.

Brown had prior convictions for robbery, aggravated assault, simple assault, and resisting arrest. He had been abused and sexually assaulted by his stepfather when he was a child, and had used narcotics. While in jail, he became suicidal and was eventually diagnosed with major depression accompanied by psychotic features. He was declared incompetent to stand trial, and he pled guilty to murder and sexual assault. The court imposed a life term with a thirty-year parole disqualifier on the murder conviction, and a consecutive ten-year term with a five-year parole disqualifier on the sexual-assault conviction.

#### B. *David Cooper*

Cooper lured a six-year-old girl out of a backyard and took her to an area underneath the porch of an abandoned house where he lived. While the victim's family members looked for her and called out her name, Cooper sexually assaulted and fatally strangled her. Police found her body several hours later. She was under the

porch, with her shirt pulled up and her panties at her ankles. The sexual assault caused her to bleed, and to suffer numerous internal injuries to her vaginal canal and cervix, as well as to her anal canal. The medical examiner concluded that she had been strangled for four to six minutes.

Cooper claimed that he was drunk during the attack, and that her death was accidental. He had prior convictions for trespassing and a drug offense, and juvenile convictions for disorderly conduct and criminal mischief. He was on parole at the time of the murder. He claimed that he drank daily and used marijuana often, but did not present evidence of his alleged alcoholism or intoxication at his penalty phase. During his childhood, Cooper had been abused, neglected, and exposed to drugs, alcohol, and violence. He was placed in numerous foster homes, and did not have a relationship with his mother, who drank heavily when pregnant with Cooper. The jury found the c(4)(f) (escape detection) and c(4)(g) (contemporaneous felony) aggravating factors, and varying numbers of jurors found several c(5)(h) (catchall) factors. The jury concluded that the aggravating factors outweighed the mitigating factors; therefore, the defendant was sentenced to death. He also received an aggregate noncapital sentence of seventy years with a thirty-five-year parole disqualifier.

## C. *Jerome Dennis 1*

The twenty-five-year-old Dennis encountered a fourteen-year-old girl on the street. He forced her at knifepoint into the bushes on the side of the road. He stabbed her twenty-four times, sexually assaulted her, tied her up, and covered her with leaves and twigs. Her body was found four months later.

Dennis had three prior sexual-assault convictions, two prior criminal restraint convictions, and one prior robbery conviction. He had been paroled just two weeks before this murder. In a four-month period, he committed this homicide and four others.

He pled guilty to felony murder, and received a life sentence with a thirty-year parole disqualifier.

### D. *Ralph Edwards*

Eighteen-year-old Edwards saw a nine-year-old girl on the platform of an abandoned railroad station. The girl was about to defecate in the station. Edwards went inside to watch, and asked her to sit with him on a mattress that was in the station. He exposed himself to her and attempted to put her on her stomach, so that he could penetrate her anally. She fought back and ran away. He gave chase, and managed to wrap a plastic strap around her neck. He yanked the strap, strangling her. She fell to the ground and hit her head. He placed her body between two track railings and left the scene. Edwards was subsequently arrested for sexually assaulting a young boy near the railroad tracks, and he confessed to the murder.

Edwards had no prior convictions. He had a history of mental and psychological problems and functioned on the emotional level of a nine year old. A jury convicted him of capital murder, felony murder, and attempted aggravated sexual assault. The jury found the c(4)(f) (escape apprehension) and c(4)(g) (contemporaneous felony) aggravating factors and the c(5)(c)(age), c(5)(d) (diminished capacity), c(5)(f) (no significant criminal history), and c(5)(h) (catchall) mitigating factors. The jury rejected the c(4)(c) (torture or depravity) aggravating factor. The jury determined that the aggravating factors did not outweigh the mitigating factors, and the court sentenced Edwards to life imprisonment with a thirty-year parole disqualifier on the murder conviction, and to a consecutive ten-year term with five years of parole ineligibility for the attempted aggravated sexual assault conviction.

### E. *Joseph Harris 1*

Harris, angry because he had lost a $10,000 investment with Ron Ellison's failed company, broke into Ellison's home. He handcuffed and blindfolded Ellison, his wife, and his seven-year-

old and nine-year-old daughters. Harris demanded money. After Ellison's wife gave him $700, Harris sexually assaulted Ellison's wife and daughters. Harris then shot and killed Ellison.

Harris believed that he was cursed because he had been born in prison and his parents had rejected him. He fantasized about violence during his childhood. By age ten, he heard voices of an Indian Chief, which ultimately subsided and were replaced by the voices of a Ninja spirit. Harris joined the Navy at the behest of the spirit, who he believed directed him to travel to Asia. He later worked at the United States Postal Service, where he would occasionally wear either Ninja garb or military camouflage outfits. While in the Navy, Harris was diagnosed as a "schizoid" and with "inadequate personality" disorder.

A jury convicted him of capital murder, felony murder, three counts of aggravated sexual assault, four counts of kidnapping, burglary, and a weapons offense. The jury found the c(4)(f) (escape detection) and c(4)(g) (contemporaneous felony) aggravating factors and the c(5)(f) (no significant criminal history) and c(5)(h) (catchall) mitigating factors. The jury rejected the proposed c(5)(a) (extreme emotional disturbance) and the c(5)(d) (diminished capacity) mitigating factors. The jury found that the aggravating factors outweighed the mitigating factors, and the court sentenced Harris to death.

### F. *James Henderson*

Henderson, who was twenty-seven years old, and nineteen-year-old Gary Lippen were driving Lippen's pickup truck when they saw their victim, a seventeen-year-old acquaintance. She accepted their offer for a ride, and they drove her to a remote wooded area. Henderson asked to see her breasts. She refused and told him to stop. He then threw her down and began to tear her shirt. Lippen fondled her and held her down while Henderson sexually assaulted her. Lippen may have also sexually assaulted her. Both beat her throughout the assault, including striking her with a stick, and Henderson began choking her with his hands. Lippen

handed a stick to Henderson, which he placed on her throat. Lippen put his hand on the stick, and the two men crushed the victim's throat. Henderson then stabbed her many times in the chest, genital area, neck, and back. They dragged her up a hill and hoisted her legs into a tree. Henderson twisted her legs around the tree and broke her legs. Henderson filled the victim's pocketbook with sand and his knife. They discarded the purse in a lake. The victim's dead body was found three months later.

Henderson apparently had one prior conviction for drug possession. Henderson had a history of mental illness, for which he had received treatment. He was emotionally disturbed, illiterate, and took special education classes in high school. He also had a significant drug problem.

Henderson pled guilty to murder and two counts of hindering apprehension. For the murder, the court sentenced Henderson to life imprisonment with a thirty-year parole disqualifier. The court imposed consecutive five-year terms with two-and-one-half-year parole disqualifiers for the hindering apprehension convictions.

### G. Gary H. Lippen

Henderson's co-defendant, Lippen, claimed that he participated in the murder because he feared Henderson. Lippen had no prior convictions and no history of mental illness. He abused alcohol, marijuana, and methamphetamines. After the victim's body was found, he was remorseful.

Lippen pled guilty to aggravated manslaughter, hindering apprehension, and conspiracy. The court sentenced him to a thirty-year term on the manslaughter conviction with a fifteen-year parole disqualifier, and a consecutive five-year term with a two-and-one-half-year parole disqualifier on the hindering apprehension charge. The manslaughter sentence was subsequently reduced to twenty years with a ten-year parole disqualifier.

## H. Michael J. Manfredonia

Nineteen-year-old Manfredonia saw the fourteen-year-old victim walking home from school. According to Manfredonia, he asked her out, and she rejected him. She then ridiculed him, making fun of the way he looked and dressed. He got a knife from his car, told her that he did not like being made fun of, and threatened to kill himself. She told him to stop acting childish, and expressed indifference to his suicide threat. He pushed her to the ground, sexually assaulted her, and stabbed her twenty-six times in the chest and back. He dragged her body through the woods and left it in a ditch after covering the body with dirt, rocks, and sticks. Police discovered her body two days later. The medical examiner concluded that fifteen of the stab wounds did not penetrate deeply into the victim's body, suggesting that Manfredonia intended that the victim suffer. He also concluded that the victim died a slow, painful death twenty to ninety minutes after the stabbing.

After learning that the victim's body had been found, Manfredonia's parents called the police. Defendant escaped through the bathroom window before the police officers arrived. Defendant returned home the next day, and his parents called police again. Manfredonia attempted suicide by ingesting several pills and slitting his wrists. Police thwarted the attempt and arrested him. While having his stomach pumped, Manfredonia claimed that he merely found the victim's body and hid it because he was afraid. The following day, he confessed to the crimes and said he did not know why he killed the victim.

Manfredonia had intermittent explosive disorder and low intelligence. His I.Q. was 78, he graduated from high school, and had no prior criminal record other than a disorderly persons theft offense. After a bench trial, the court convicted him of purposeful-or-knowing murder, felony murder, aggravated sexual assault, kidnapping, and a weapons offense. The court found present the c(4)(c) (torture or depravity), c(4)(f) (escape apprehension), and

c(4)(g) (contemporaneous felony) aggravating factors. The court also found the c(5)(a) (emotional disturbance), c(5)(c)(age), and c(5)(f) (no significant prior record) mitigating factors. The court concluded that the mitigating factors outweighed the aggravating factors and sentenced the defendant to an aggregate term of life plus fifty years with a fifty-five-year parole disqualifier.

## I. *Rasheed Muhammad*

Rasheed Muhammad kidnapped, sexually assaulted, and murdered eight-year-old Jakiyah McClain. The victim went to her friend's apartment building to play. Her friend saw her enter the building with Muhammad, and then heard kicking, banging, and screaming upstairs. The next day, police spoke with the building superintendent who said that he had given Muhammad permission to stay in an abandoned apartment in the building. Police knocked on Muhammad's door, and he invited them in. Police found the victim's body under a pile of clothes in a closet. An autopsy revealed that the victim had been sexually assaulted and died of asphyxiation.

The jury convicted Muhammad of purposeful-or-knowing murder, felony murder, kidnapping, and two counts of aggravated sexual assault. During the penalty phase, Muhammad offered evidence that his parents abused drugs and alcohol, that both parents abandoned and neglected him, that he saw his mother stab his father at age three, that his mother's lover physically abused him, that he began running away from home at age ten, that he was improperly advanced through school, that he was sexually abused as a child, that he began abusing drugs at age twelve, that he had abused heroin, cocaine, and alcohol on a daily basis for twenty years, that he suffered several concussions and other untreated head injuries, that he suffered from emotional instability resulting in two suicide attempts, and that he suffered severe emotional trauma when he fought for and lost custody of his two children. Muhammad was twenty-nine years old at the time of the offense, and had prior convictions for larceny, breaking

and entering, and breaking into a coin-operated machine, and was on probation at the time of the offense. The jury found the c(4)(g) (contemporaneous felony) and c(4)(k) (victim less than fourteen years old) aggravating factors and all of the catchall mitigating factors, but was hung on the death penalty. Muhammad was sentenced to life without parole on the murder charge, and a consecutive fifty-year term and twenty-five-year parole disqualifier for the kidnapping.

### J. Frederick Ritchie

Ritchie enticed the victim, a twelve-year-old boy, to sneak out of his parents' house. They went to Ritchie's trailer, where Ritchie got the victim drunk. While reading pornographic magazines, Ritchie masturbated and inserted a dildo into his anus and another into the victim's anus. Afterward, the victim severely injured his head twice. Ritchie claimed that the victim, due to the intoxication, fell into the washing machine. Later, Ritchie wrapped the victim in a blanket and took him to a creek in nearby woods. Ritchie claimed that the victim walked into a tree, struck his head, and fell backward. Ritchie fled, and the victim was later found naked and face-down in a creek. He died from drowning and the head injuries. Ritchie cleaned his trailer and discarded any evidence of the victim's presence. He confessed after he was arrested for sexually assaulting a seven-year-old boy.

Ritchie had prior convictions for burglary, lewd and lascivious/crimes against children, indecent exposure, and indecent proposal to a child. He was an Army veteran, and had been diagnosed with Crohn's disease. He also was an alcoholic who had received treatment in the past.

Ritchie pled guilty to aggravated manslaughter, two counts of aggravated sexual assault, attempted aggravated sexual assault, kidnapping, and hindering apprehension. On the aggravated manslaughter count, the court sentenced him to a thirty-year term of imprisonment, with an eleven-year parole disqualifier.

### K. Leroy Taylor

Taylor became angered when his girlfriend told him that she was involved with another man. He went to his girlfriend's apartment and sexually assaulted and strangled the girlfriend's thirteen-year-old niece. Taylor's girlfriend found the victim, whose pants were removed and panties were torn and blood-stained, lying on the floor of the master bedroom. Taylor's girlfriend initially told police that Taylor had confessed to her, but later retracted that claim. Taylor provided police with the clothes he had been wearing during the crime, but when they requested blood and hair samples, he fled to California.

As a juvenile, Taylor had been convicted of killing a four-year-old girl. Authorities could not determine if he had also sexually assaulted the girl because her body was so decomposed. Taylor was on parole when he committed this crime. He had dropped out of high school, earned his G.E.D., and worked as an airport maintenance serviceman. He denied a history of drug or alcohol abuse.

Taylor pled guilty to felony murder, first-degree aggravated sexual assault, and witness tampering. He was sentenced to life imprisonment with a thirty-year parole disqualifier on the felony murder conviction.

### L. Alphonso Timpson

Nineteen-year-old Timpson forced a twelve-year-old girl into the woods as she was walking home from school. She fought with him, but he beat her severely and knocked her unconscious. He penetrated her vagina with his fingers and his penis. He also nearly bit off her breast. The victim screamed when she regained consciousness. He stuffed her panties in her mouth, and she suffocated and died. As she was gasping for breath and dying, he continued to sexually assault her.

Timpson initially denied involvement, but ultimately confessed. He blamed the killing on a series of arguments with his parents,

his friends, his ex-girlfriend, and his ex-girlfriend's brother. Timpson had severe developmental disabilities and was borderline mentally retarded. At age nineteen, when he committed this crime, he had the mental development of a twelve-year-old child. As a student, he acted violently when he became frustrated or angry. He was diagnosed as being highly impulsive and unable to exhibit emotional control. Moreover, he had a low frustration tolerance and responded to stress with quick and uncontrollable behavior. He smoked two joints and drank two cases of beer each day. As a juvenile, he attacked a girl under similar circumstances to this offense.

Timpson pled guilty to capital murder, aggravated sexual assault, and kidnapping. The plea was conditioned on the trial court sentencing him to life imprisonment after a penalty hearing. The court found the c(4)(c) (torture or depravity) and c(4)(g) (contemporaneous felony) aggravating factors, and the c(5)(a) (extreme emotional disturbance), c(5)(c)(age), c(5)(d) (diminished capacity), and c(5)(h) (catchall) mitigating factors. The court found that the mitigating factors outweighed the aggravating factors and imposed an aggregate sentence of life imprisonment plus fifty years with a fifty-five-year parole disqualifier.

M. *Mark Luciana*

Twenty-year-old Mark Luciana attended a party with a fifteen-year-old female and several other friends. After midnight, the group left to go swimming at a nearby wooded area. When they arrived, Luciana and the fifteen-year-old walked into the woods, where Luciana strangled her to death with her brassiere. Afterwards, Luciana rejoined his friends and told them that the victim had left to go to the bathroom. He dropped two of the friends off, and one, who had passed out, remained in the car. Luciana drove back to the crime scene and put the victim's body in the trunk of the car. He drove to a motel. When his friend awoke the next morning, Luciana showed him the body. They left the car at the motel. Within a few days, the friend reported the body to police

and Luciana turned himself in. Police also heard from Luciana's ex-girlfriend that he became violent after drinking and being refused sex, and from Luciana's cellmate, who related Luciana's statements about getting sexual gratification from the murder and from inflicting pain during sexual encounters.

Luciana was charged with purposeful-or-knowing murder, felony murder, aggravated sexual assault, hindering apprehension, and endangering the welfare of a child. A jury found him guilty on all counts. At the penalty phase, the defense presented evidence that Luciana dropped out of high school after ninth grade, but later received his GED and attended classes at a community college. At the time of the murder, he was employed in his step-father's paving business. There was evidence that Luciana had both an alcohol and drug problem and was subject to physical and emotional abuse as a child. A defense psychologist suggested that Luciana was very immature for his age and had an anti-social personality disorder, stemming from neglect as a child. Luciana testified, as did the psychologist, that he was intoxicated at the time of the killing from eighteen beers and marijuana, although that was not consistent with other witnesses' testimony. Luciana also stated that he feels little empathy for those around him. As for remorse, Luciana tearfully testified that he could not undo the terrible thing he did, that he did not mean to kill the victim, and that he was truly sorry, and asked the jury to spare his life. Luciana has one prior conviction for drug possession and receiving stolen property.

The jury found the c(4)(f) (escape detection) and c(4)(g) (contemporaneous felony) aggravating factors and the c(5)(c)(age), c(5)(d) (diminished capacity), c(5)(f) (no significant prior criminal history), and c(5)(h) (catchall) mitigating factors. The jury rejected the c(4)(c) (torture or depravity) and c(5)(a) (extreme emotional disturbance) factors. The jury was unable to reach a decision regarding the weighing of the factors. The court sentenced Luciana to life imprisonment with a thirty-year period of parole

ineligibility for the murder and to an aggregate consecutive sentence of nineteen years for the other charges.

### N. Lester A. Wilson

Wilson resided in the same hotel as the victim, who was fourteen years old. One evening, Wilson strangled and sexually assaulted the victim, who was found with a pillow covering her face. While waiting for an ambulance that he needed after unsuccessfully attempting to escape from the police station by jumping through the bathroom window, Wilson confessed to killing the victim.

Wilson was mildly retarded. He had no prior convictions.

The State did not prosecute Wilson capitally. A jury convicted him of murder and aggravated sexual assault. The court sentenced him to life imprisonment with thirty years of parole ineligibility for the murder and to a concurrent fifteen-year prison term for the aggravated sexual assault.

## II. Cases Proposed by Public Defender to which the Attorney General Objects

### A. Kevin Conley

One night, Conley entered the eighty-seven-year-old victim's home and beat, raped, stabbed, and fatally strangled her. The victim suffered blunt force trauma and stab wounds to her face, neck, and extremities and a fracture of her nasal bones and her right zygomatic arch. The victim was found the following morning wearing a torn, pink nightgown, with a telephone line, which had been cut, draped across her body. Her stomach was oily and shiny, and a toppled bottle of baby oil rested on the night stand. Conley was apprehended nearly sixteen months later because his fingerprints matched those found on the baby oil bottle. Apparently, there was no other evidence connecting Conley to the crime.

Conley was a twenty-nine-year-old college graduate who had completed thirteen credits toward a master's degree. He spent

eight years in the Army Reserves. He had no prior criminal record. He worked for a rental car company and used alcohol occasionally.

The State tried Conley noncapitally. A jury convicted him of purposeful-or-knowing murder, felony murder, aggravated sexual assault, burglary, and a weapons offense. The court sentenced him to an aggregate term of life imprisonment plus twenty-six years with a thirty-eight-year parole disqualifier.

### B. Frank Masini 1

Masini stopped at his eighty-five-year-old aunt's home purportedly to use her telephone. While washing out a soda glass in the kitchen sink, he saw a knife. He repeatedly stabbed his aunt in the neck, killing her. He also vaginally and anally raped her.

Masini had no prior criminal history, but this was one of four fatal stabbings he committed against elderly people. In the months before this murder, Masini experienced detachments from reality. Masini pled guilty to murder and received a life sentence with a thirty-year period of parole ineligibility.

### C. Frank Masini 3

Two weeks after killing his aunt, Masini was at the home of his eighty-year-old relative. After talking with her in the kitchen, he grabbed a knife from the kitchen counter, grabbed the victim from behind, stabbed her repeatedly in the neck, sexually assaulted her, and stole her ring. She died from the stab wounds. Masini pled guilty to the murder and received another life sentence and thirty-year parole bar, which ran concurrently to the sentence he received for killing his aunt and to the consecutive life sentences he received for murdering an elderly couple.

### D. Samuel Mincey

Mincey broke into the home of the victim, who was seventy-three years old. He beat her severely, raped her, and strangled

her. He stole two oriental dolls and a television. Mincey was arrested six years later. Mincey had sixteen prior convictions, including convictions for aggravated assault, assault and battery, burglary, auto theft, receiving stolen property, and escape.

The State did not prosecute Mincey capitally, perhaps because the prosecutor believed that the statute of limitations barred a capital prosecution. A jury convicted Mincey of murder and felony murder. The court sentenced him to life imprisonment with a thirty-year parole disqualifier.

### E. *Rafael Rivera*

Rivera lived next door and had a close relationship with the victim, who was a seventy-eight-year-old widow. She often babysat for Rivera's children, who called the victim their grandmother. While the victim was visiting Rivera and his girlfriend, Rivera went into her apartment and looked for money. The victim returned to her apartment and surprised Rivera. A struggle between Rivera and the victim ensued. Rivera struck her many times in the face, forearms, ribs, and back. He tore her vagina with either his hand or her cane. The cause of death was strangulation.

Rivera had prior convictions for possessing a stolen car, entry with intent to steal, receiving stolen property, weapons possession, and eleven disorderly persons offenses. He had a history of abusing cocaine, marijuana, and alcohol. He was seen drunk shortly before the murder.

A jury convicted Rivera of capital murder, robbery, aggravated sexual assault, and burglary. The jury found the c(4)(c) (torture or depravity) and c(4)(g) (contemporaneous felony) aggravating factors and the c(5)(d) (diminished capacity) and c(5)(h) (catchall) mitigating factors. It rejected the c(4)(f) (escape detection) aggravating factor and the c(5)(c)(age) mitigating factor. The jury could not agree on whether the aggravating factors outweighed

the mitigating factors. The court sentenced him to life imprisonment with a thirty-year parole disqualifier for the murder.

### F. *Otis James*

On May 11, 1994, a woman awoke to find James lying on the floor next to her bed. He placed his hand over her mouth, motioned for her to be quiet, and began to fondle her. The woman screamed for her daughter, prompting James to flee, knocking over the woman's daughter as she entered the room. James left through the bathroom window.

While investigating the burglary, police noticed that a window in an upstairs apartment was open. The police found an eighty-two-year-old female in the upstairs apartment lying on her bed stomach-down, nude below the waist. Her legs were spread apart and a gel had been spread over her vaginal and anal area. A chair had been pulled up to the bed next to the woman's exposed genitalia. It was determined that the woman had been sexually assaulted and was killed by asphyxia due to smothering and compression of the neck.

James claims he was drunk and high when he committed the offense, and only intended to steal money or property to support his drug habit. He claims not to remember sexually assaulting the eighty-two-year-old woman or noticing that she was dead. Despite participating in several substance-abuse treatment programs, he abused alcohol and cocaine daily. James apparently started drinking at age five.

James never met his father and his mother died in a car accident when he was eleven. After his mother's death, James and his two siblings were raised by different relatives. James dropped out of high school after tenth grade. He obtained a truck driving certificate but was unemployed at the time of the offense. He once attempted suicide, and was subsequently hospitalized and diagnosed with depression. At the time of the offense, James was twenty-eight years old and living with his sister. He had prior

convictions for robbery, burglary, attempted burglary, theft, resisting arrest, disorderly conduct, and shoplifting. He was on parole when he committed the murder.

James was arrested on September 29, 1995, for the attempted murder of another woman. He was identified as the culprit in the May burglary and murder through fingerprints and similarities between the May and September crimes. James was charged with two counts of burglary, felony murder, murder, two counts of aggravated sexual assault, attempted sexual assault and aggravated criminal sexual contact. He pled guilty to felony murder and was sentenced to life imprisonment with thirty years parole ineligibility.

### G. Carlos Vasquez (Subcategory B–1)

Purportedly by talking to her about religion, Vasquez lured the victim, a thirteen-year-old girl, into his apartment. While in his apartment, he held her down, raped her, and fatally strangled her with a towel.

While living in Puerto Rico, Vasquez was convicted of murder. He was paroled six years before this murder. He denied having mental health problems or abusing drugs or alcohol.

Vasquez pled guilty to felony murder and aggravated sexual assault. The court sentenced him to life imprisonment with a thirty-year parole disqualifier for the murder and to a consecutive twenty-year term with a ten-year parole bar for the aggravated sexual assault.

### H. Kevin Aquino (H–1)

Desperately seeking sex, Aquino went into a neighbor's home, where the six-year-old victim and her sister were sleeping. The victim's parents were attending a party at Aquino's parents' home. Aquino rang the doorbell, but nobody answered. He broke a window, went into the home, and removed the victim. He carried her to his backyard, where he intended to have sex with her. She

awoke and made noise, and his attempts to quiet her were unsuccessful. He dragged her to a wooded area behind his home. Intending to kill her because he feared getting caught for kidnapping the victim, he smashed the victim's head against a tree. Afterward, he dragged her to a nearby brook and left her. She died from a fractured skull and cerebral hemorrhage.

Aquino was a nineteen-year-old student at a community college. He was placed in foster care when he was three years old after he overdosed on prescription medication. At that time, he was emotionally deprived, did not speak, and was not toilet trained. Aquino was adopted when he was four-and-a-half years old. Due to his aggressive behavior, a child study team evaluated Aquino and determined that he was emotionally disturbed and neurologically impaired. For three years, Aquino attended school at a children's psychiatric center. Thereafter, he enrolled in special education classes at public school. He graduated from high school, but needed to repeat his first-semester courses at community college. Besides attending community college, Aquino worked part-time for a fast-food restaurant.

When he was seventeen years old, Aquino was convicted of three counts of aggravated sexual assault, in which he victimized his younger brother, a five-year-old girl, and a four-year-old boy. A year before the murder, Aquino was arrested twice for criminal trespass. In the second trespassing incident, Aquino was found in a girls' bathroom; he explained he was there because the sound of girls urinating excited him. Two weeks before the murder, Aquino attempted to lure a thirteen-year-old child into his home and was charged with disorderly conduct. Aquino was diagnosed with impulse control disorder. His doctor concluded that his increasingly violent sexual thoughts toward children made him dangerous and in need of constant supervision.

Aquino pled guilty to purposeful-or-knowing murder, felony murder, and kidnapping. A court sentenced him to two consecu-

tive terms of life imprisonment plus an aggregate fifty-five-year parole disqualifier.

## I. *Daniel Nicini (F–3)*

Co-defendant Thomas Felmey III devised a plan to rob a sixty-seven-year-old homosexual man. Felmey told Nicini to pretend to be homosexual and allow the man to pick him up. Felmey said that Nicini and the man should go to the nearby game preserve, where Nicini should blindfold him, rob him, and leave him in the trunk of his car.

A few weeks later, Felmey drove Nicini to the location where the victim sat in his car. Nicini approached him, and the two men went to the game preserve. The victim grabbed Nicini's testicles and buttocks. Nicini pointed a toy gun at him, and a struggle ensued. Nicini punched the victim and stole his money, wallet, and keys. Felmey drove by in his car as Nicini was putting the victim into the victim's car trunk. The victim recognized Felmey and said he knew that Felmey was involved with the robbery. Felmey and Nicini each drove to Felmey's home. Felmey told Nicini to take the victim to the woods and kill him because the victim had identified him. Nicini, Felmey, and two women drove the victim to an isolated dirt road. Felmey told Nicini to abandon the car on a trail in the woods.

Nicini drove further into the woods and opened the trunk, which he propped open with a stick. Upon observing that the victim was holding a crowbar and a knife, Nicini removed the stick and caused the trunk to hit the victim on the head. Nicini then pulled the victim out of the trunk, tied the victim's hands behind his back, and tied a rope around his neck. Nicini looped the rope around a tree branch and attempted to hang the victim. The rope broke, and the victim fell. Nicini tied the rope to the front bumper and made the victim walk with the car. Nicini would help the victim up whenever he fell. Next, Nicini, dragging the victim, drove the car in reverse at a high rate of speed. Nicini cut the rope and left the victim in the woods, where hunters discovered his dead body

over one week later. A subsequent autopsy revealed that the victim died of ligature strangulation and suffocation.

After the murder, Nicini washed the victim's automobile at a car wash and left the vehicle in front of the victim's home. The following day, Felmey drew a map of the victim's home that illustrated the location of the victim's money, guns, and drugs. Nicini stole $320, a .22 rifle, and miscellaneous other items. On the day hunters found the victim's body, police apprehended Felmey and Nicini, both of whom confessed.

Nicini was a nineteen-year-old unemployed high-school dropout who had once worked at a fast-food restaurant. He had no prior adult criminal record. He had used alcohol, marijuana, and cocaine and said he drank a case of beer about one hour before commencing the crimes.

The State did not capitally prosecute Nicini, and he pled guilty to felony murder and burglary. The court sentenced him to life imprisonment plus five years with a thirty-three-year parole disqualifier.

### J. *Kenneth Querns* [1]

Querns kidnapped and strangled a nine-year-old girl. He saw her outside of her home, and took her in his car to his home, where he kept her for four to five hours. He eventually took her out in his car and strangled her. Her body was subsequently found in a vacant field. She had two stab wounds to the neck, and was not wearing underpants beneath her one-piece outfit. There was no evidence of sexual penetration, and Querns denied sexually assaulting her.

Querns was an alcoholic, and he claimed that he was intoxicated at the time of the crime. During his childhood, he was physically and emotionally abused by his mother, sexually abused by his

---

[1] Because this case is not yet in the death-eligible universe, we draw the factual recitation from the parties' briefs and appendices.

Sunday School teacher, and was often exposed to drug and alcohol abuse, as well as sexual activity. He had a prior conviction for sexual assault, as well as two harassment convictions for making obscene telephone calls to young girls.

Querns pled guilty to aggravated manslaughter and kidnapping. The court sentenced him to an aggregate forty-five year prison term.

LONG, J., dissenting.

Megan Nicole Kanka is frozen in our collective consciousness because of her beauty, her innocence and the horrific way in which she died. She is remembered as well because of the stalwart efforts of her parents who spearheaded the enactment of Megan's Law in an effort to save other children from their daughter's fate.

To trivialize, even obliquely, the crime against Megan Kanka would be unspeakable. Indeed any normal heart responds with a cry for vengeance when faced with an offense like this. But it is precisely in matters such as the one before us that we must set aside our deepest emotions and plumb the depths of our core of rationality in order to account for our stewardship.

That stewardship entails the task of proportionality review—a unique exercise in our law. Unlike direct review, proportionality review does not question whether an individual death sentence is justified by the facts and circumstances of the case or whether, in the abstract, the sentence imposed on a defendant is deserved on a moral level. On the contrary, its role is to place the sentence imposed for one terrible murder on a continuum of sentences imposed for other terrible murders to ensure that the defendant "has not been 'singled out unfairly for capital punishment.'" *State v. Cooper,* 159 *N.J.* 55, 88, 731 *A.*2d 1000 (1999) (*Cooper II*) (citing to *State v. Martini,* 139 *N.J.* 3, 47, 651 *A.*2d 949 (1994) (*Martini II*)), *cert. denied,* 516 *U.S.* 875, 116 *S.Ct.* 203, 133 *L.Ed.*2d 137 (1995) When that very particularized assignment is undertaken in the bright light of reason, it is evident that Jesse Timmendequas should not have been condemned to death.

## I.

The media's coverage of this case was almost unparalleled. So widespread was the shock at the murder of Megan Kanka that, as the majority notes, reaction to the case " 'changed the legal landscape for sex offenses nationwide.' " *Ante* at 28, 773 *A*.2d at 22 (citing to *State v. Timmendequas*, 161 *N.J.* 515, 650, 737 *A*.2d 55 (1999) (Handler, J. dissenting)). Despite the trial court's efforts to keep any reportage of the case from the eyes and ears of the jurors, inevitably some prejudicial information slipped through: "[t]he result was that all but two jurors on the case knew or suspected that [Timmendequas] had a prior record. Of those ten, nine at least suspected that his prior record included a sex offense conviction, and one knew as much." *Timmendequas*, 161 *N.J.* at 669, 737 *A*.2d 55.

On that backdrop, the trial court "never instructed [the jury] that the significance of those prior convictions was not a permissible factor for consideration in the penalty-phase deliberations." *Id.* at 650, 737 *A*.2d 55 (Stein, J. concurring in part and dissenting in part). Because of the unacceptable risk that the jurors took Timmendequas' prior record into account in their sentencing decision, we are left "[w]ithout accurate and reliable findings concerning aggravating and mitigating circumstances." *State v. Harris*, 165 *N.J.* 303, 387, 757 *A*.2d 221 (2000) (*Harris II*) (Long, J., dissenting). That makes it impossible for us to compare Timmendequas' case with other cases to determine his relative culpability. Lacking the ability to perform even this most basic of tasks, we cannot "administer the most extreme penalty in a fair and consistent manner." *State v. Loftin*, 157 *N.J.* 253, 279, 724 *A*.2d 129 (1999)(*Loftin II*), *cert. denied*, 528 *U.S.* 897, 120 *S.Ct.* 229, 145 *L.Ed.*2d 193 (1999).

## II.

Many of the deficiencies in individual proportionality review have been discussed extensively elsewhere. *See In re Proportionality Review Project*, 161 *N.J.* 71, 100–06, 735 *A*.2d 528 (1999)

(*Proportionality Review I*) (Handler, J., concurring in part and dissenting in part) (criticizing Court's standard for assessing disproportionality); *State v. DiFrisco*, 142 *N.J.* 148, 224–31, 662 *A.*2d 442 (1995) (*DiFrisco III*) (Handler, J., dissenting) (criticizing principle of unique assignment), *cert. denied*, 516 *U.S.* 1129, 116 *S.Ct.* 949, 133 *L.Ed.*2d 873 (1996); *Martini II, supra*, 139 *N.J.* at 90–91, 651 *A.*2d 949 (Handler, J., dissenting) (discussing lack of statistical standard to measure disproportionality under frequency review); *State v. Marshall*, 130 *N.J.* 109, 249–50, 263–65, 613 *A.*2d 1059 (1992) (*Marshall II*) (Handler, J., dissenting) (criticizing coding of reversed death sentences as death sentences; inconsistency and inherent subjectivity of proportionality tests; inclusion of defendant's own case in frequency analysis; and abandonment of generally-imposed standard for proportionality), *cert. denied*, 507 *U.S.* 929, 113 *S.Ct.* 1306, 122 *L.Ed.*2d 694 (1993). In two recent cases, I expressed my own objections to the way we have conducted proportionality review. *See State v. Morton*, 165 *N.J.* 235, 288–289, 757 *A.*2d 184 (2000) (*Morton II*) (Long, J., dissenting); *State v. Feaster*, 165 *N.J.* 388, 444, 757 *A.*2d 266 (2000) (*Feaster II*) (Long, J., dissenting). I take this opportunity to underscore the concerns I previously expressed.

In a nutshell, despite our expressed belief that the New Jersey Constitution provides a "more expansive source of protections against the arbitrary and nonindividualized imposition of the death penalty" than does the United States Constitution, *State v. Ramseur*, 106 *N.J.* 123, 190, 524 *A.*2d 188 (1987), our proportionality review has fallen short of guaranteeing that the death penalty is fairly administered. More particularly, the permeable boundaries of the process; its flaccidity; the constant change in standards from case to case; the utterly subjective way in which even legitimate standards are applied; and the consistent practice of the Court to focus only on the aggravating aspects of the case under review while underscoring the mitigating factors of the comparison cases allows the Court to conclude that virtually any death sentence is proportional. This case is emblematic of those deficiencies.

It is time for the members of this Court to accept that there is simply no meaningful way to distinguish between one grotesque murder and another for the purpose of determining why one defendant has been granted a life sentence and another is awaiting execution. The very exercise of individual proportionality review stands on a fundamentally unstable pediment. It should thus be scrapped and a moratorium declared on the death penalty until a meaningful process is developed.

## III.

Like the majority, I am satisfied with a consolidation of the D–1 and D–2 categories for this exercise. In terms of frequency analysis, I also agree that, because there is not a dramatic difference in death sentencing rates between D1–D2 homicides and other death-eligible homicides, precedent-seeking review is the critical path to any purported proportionality determination. It is here that I part company from my colleagues.

The precedent-seeking analysis performed by the majority in this case follows the format of all prior proportionality review opinions. It begins with a "subjective moral evaluation" of Jesse Timmendequas, presumably as a benchmark for the other comparisons. *Feaster II, supra,* 165 *N.J.* at 459, 757 *A.*2d 266. To be sure, that evaluation is more measured than we have seen in the past, yet its result is still foreordained.

### A. Moral Blameworthiness

The majority catalogues the following factors as undergirding its view that this case possesses a high level of moral blameworthiness: the horrific nature of the crime; that Timmendequas knew of Megan's helplessness; that he lured her with a puppy; that he killed her to escape detection; that he participated in the search and lied to the police; and the effect of the crime on Megan's family. Against that litany, the majority concludes that neither Timmendequas' background, his pedophilia, nor his age is mitigating.

Timmendequas' background requires recounting here. Born with fetal alcohol effect and classified as educable retarded, his home life was nothing short of nightmarish. He was raised in abject poverty without adequate food, housing, or medical care, often filthy, hungry and lice ridden, and sometimes living out of cars. His mother, who was assessed by one professional as "hating" her children, was an alcoholic who constantly brought men home for sexual encounters. His father sexually assaulted him and his brother several times a week over a course of years; his brother still recalls hearing him scream. His father also forced him, at age eight or nine, to watch as he raped a seven-year old girl. Finally, his father tortured the family's pets, cut off the head of the family cat in the children's presence, and even forced his children to eat their pet rabbit.

To be sure, capital cases regularly detail the abuse suffered by defendants. But even when viewed on that miserable backdrop, this case stands out, and the short shrift the majority accords Timmendequas' past reveals the trajectory of its analysis.

Further, the majority notes that Jesse Timmendequas is a pedophile but gives that fact no mitigational import. When used to denote sexual preference, of course, pedophilia is not in itself mitigating. And, in fact, consensus has yet to be reached in the scientific community on the precise etiology of pedophilia. *See generally* William Winslade, T. Howard Stone, Michelle Smith Bell & Denise M. Webb, *Castrating Pedophiles Convicted of Sex Offenses Against Children: New Treatment or Old Punishment,* 51 *SMU L.Rev.* 349, 364–65 (1998). Nevertheless, our public policy, as manifested by acts of the Legislature, makes clear that we, as a society, believe that many sex offenders, particularly pedophiles, have an illness; they can be distinguished from other classes of offenders in that they are not likely to be rehabilitated and are bound to reoffend. *See N.J.S.A.* 2C:7–1 (explaining that the "danger of recidivism posed by sex offenders and offenders who commit other predatory acts against children ... require[s] a system of registration that will permit law enforcement officials to

identify and alert the public when necessary for the public safety").

What is mitigating about pedophilia, then, is the way in which it expresses itself in one's behavior. Timmendequas' prior commitment to the Adult Diagnostic and Treatment Center was based upon the characterization of his conduct as repetitive and compulsive. *See N.J.S.A.* 2C:47–3(b) (stating that if a "court finds that an offender's conduct was characterized by a pattern of repetitive, compulsive behavior ... [it] shall, upon the recommendation of the Department of Corrections, sentence the offender to a term of incarceration to be served in the custody of the commissioner at the Adult Diagnostic and Treatment Center for sex offender treatment"). If his conduct was compulsive, how could that not be mitigating? Thus, while the majority is correct that pedophilia does not rise to the level of defect such as to excuse his crime, it must be viewed as affecting his level of moral blameworthiness.

In addition, the fact that Jesse Timmendequas was thirty-three-years old at the time of the crime is viewed by the majority as non-mitigating in that he was " 'old enough to know right from wrong.' " *Ante* at 42, 773 *A.*2d at 31 (citing to *Harris II, supra,* 165 *N.J.* at 324, 757 *A.*2d 221). However, to say that his age is not a mitigating factor does violence to the very notion of age as relevant to moral blameworthiness at all. Age mitigates to the extent that it reflects an immaturity on the part of a defendant—a level of moral reasoning and self-control that has not yet reached an "adult" level. Indeed, that basic principle is not foreign to New Jersey death penalty jurisprudence. *See State v. Bey,* 129 *N.J.* 557, 612, 610 *A.*2d 814 (1992) (*Bey III*) (holding that "[i]n determining a defendant's 'relative' youth, a jury must look beyond chronological age to considerations of defendant's overall maturity" and citing to cases from other jurisdictions that take the same position), *cert. denied,* 513 *U.S.* 1164, 115 *S.Ct.* 1131, 130 *L.Ed.*2d 1093 (1995).

Here, Jesse Timmendequas was identified as educable mentally retarded as a child, a designation that reflects both a subaverage

IQ as well as multiple adaptive limitations. *See* Dennis W. Keyes, William J. Edwards & Timothy J. Derning, *Mitigating Mental Retardation in Capital Cases: Finding the "Invisible" Defendant*, 22 *Mental & Physical Disability L.Rep.* 529, 530–31 (1998) (comparing definitions of mental retardation given by the American Association on Mental Retardation and the American Psychiatric Association). Moreover, there is little doubt that his " 'mental and emotional development' " were stunted at an early age due to the extreme abuse he suffered at the hands of his parents. *Bey III, supra*, 129 *N.J.* at 612, 610 *A.*2d 814 (citing to *Eddings v. Oklahoma*, 455 *U.S.* 104, 116, 102 *S.Ct.* 869, 877, 71 *L.Ed.*2d 1, 12 (1982)). What does all of that mean if not that his chronological age overstates his capacity?

Indeed, in a number of proportionality review cases, the Court has found borderline intelligence to be mitigating. See *Harris II, supra*, 165 *N.J.* at 339, 757 *A.*2d 221; *State v. Chew*, 159 *N.J.* 183, 217, 731 *A.*2d 1070 (*Chew II*), *cert. denied*, 528 *U.S.* 1052, 120 *S.Ct.* 593, 145 *L.Ed.*2d 493 (1999); *Cooper II, supra*, 159 *N.J.* at 96, 100, 731 *A.*2d 1000; *Loftin II, supra*, 157 *N.J.* at 340, 724 *A.*2d 129. The Court even found a defendant's "cultural retardation" to be mitigating, although that defendant was not mentally retarded. See *State v. Harvey*, 159 *N.J.* 277, 318, 731 *A.*2d 1121 (1999) (*Harvey III*); *id.* at 408 n. 25, 731 *A.*2d 1121 (Handler, J., dissenting). Given Timmendequas' deficiencies, and the fact that his emotional growth was stunted perhaps as far back as when he was forced to watch as his own father-undoubtedly his first and most influential model-raped a young child, how could anyone legitimately conclude that Timmendequas' mental and emotional age is not mitigating?

The majority also focuses on the fact that Timmendequas killed to escape detection. I do not view the escape detection factor as a legitimate aggravator, except where a third party eyewitness is killed to silence him or her. *Morton II, supra*, 165 *N.J.* at 290–291, 757 *A.*2d 184 (Long, J., dissenting). In my opinion, a defendant who kills to escape detection is no more culpable than one who kills a victim who resists. Further, because the escape

detection factor is so pervasive, I believe, as did Justice Handler, that its universal application "destroys its efficacy as an appropriate aggravating factor." *Harvey III, supra,* 159 *N.J.* at 386, 731 *A.*2d 1121 (Handler, J., dissenting).

Likewise, I continue to oppose the inclusion by the majority in this and other cases of the notion of family victimization, not because it is not terribly real, but because it is universal and thus cannot serve as a basis to distinguish between defendants. *Morton II, supra,* 165 *N.J.* at 293, 757 *A.*2d 184 (Long, J., dissenting) (criticizing Court's application of the "non-decedent victim factor" to "every case in which the victim was a 'unique person' with a 'web of familial relations'—in other words, to every single murder case") (citation omitted). The majority should not have accorded any weight to that factor in this case. That is especially true because family victimization is not once alluded to by the majority in describing any of the comparison cases, although it is clear that the victims in those cases also had families.

One final note on blameworthiness: the majority opines that because Jesse Timmendequas lured Megan with a puppy, his blameworthiness is enhanced. That is just another example of the Court's willingness to denominate whatever methodology a defendant uses to commit his crime as a factor rendering him more blameworthy. *Cf. Cooper II, supra,* 159 *N.J.* at 90, 731 *A.*2d 1000 (holding that fact that defendant promised his victim ice cream to lure her to his place of residence aggravated his offense); *Chew II,* 159 *N.J.* at 212, 731 *A.*2d 1070 (holding that fact that at the time of the murder the victim was sitting in driver's seat of car and could not exit through driver's side door was aggravating); *DiFrisco III, supra,* 142 *N.J.* at 203, 662 *A.*2d 442 (holding that fact that defendant "affix[ed] tape to his fingertips" to avoid leaving fingerprints increased his blameworthiness). That is a fundamental problem with the process.

### B. Victimization

I agree with the majority that the crime against Megan Kanka was terrible, and that the degree of victimization in this case was high.

## C. Character of Defendant

The majority has denominated Timmendequas' "participation in the search and lying to police" as increasing his moral blameworthiness and reflecting badly on his character. *Ante* at 41, 773 A.2d at 30. Those conclusions fail to account for his retarded emotional and intellectual functioning. This is not a case of a clever felon weaving a web of deceit to mislead the police, and in fact, leading them astray. Here, Jesse Timmendequas' pathetic pretense of searching for Megan was the act of an intellectually and emotionally retarded person seeking to avoid punishment, not an indicator of enhanced blameworthiness.

I also take issue with the majority's use of Timmendequas' prior criminal record as an aggravating character trait. The fact that he has committed prior acts of sexual assault serves only to illustrate the compulsive nature of pedophilia.

Somewhat inconsistently, the majority then accepts, without hesitation, Timmendequas' concession that his "pedophilic urges" make rehabilitation unlikely. *Ante* at 43, 773 A.2d at 32. His chances of being rehabilitated are, in fact, non-existent. Nonetheless, the majority cannot accept pedophilia as compulsive for purposes of determining likelihood of rehabilitation but not when it comes to analyzing his moral blameworthiness.

### IV.

### Comparison Cases

Our duty in this portion of proportionality review is to ensure that Timmendequas has not been " 'singled out unfairly for capital punishment.' " *Cooper II, supra,* 159 *N.J.* at 88, 731 A.2d 1000 (quoting *Martini II, supra,* 139 *N.J.* at 47, 651 A.2d 949); *accord Chew II, supra,* 159 *N.J.* at 210, 731 A.2d 1070. Considering both a defendant's crime and his character, it is our responsibility to determine whether the sentences imposed in the comparison cases render his death sentence disproportionate. For purposes of that analysis, I agree with the logic of the majority in expanding the

list of comparisons beyond the agreed-upon cases to include cases involving other crimes against extremely vulnerable victims.

### A. Agreed–upon Cases

The fourteen agreed-upon cases are David Cooper, Joseph Harris, Jerome Dennis, James Henderson, Leroy Taylor, Michael Manfredonia, Vincent Brown, Rasheed Muhammad, Ralph Edwards, Gary Lippen, Frederick Richie, Alphonso Timpson, Mark Luciana and Lester Wilson. Of the fourteen, only two received the death penalty.

The majority concedes that the death—worthiness of one of the two death-sentenced defendants—Joseph Harris—exceeds that of Timmendequas but inexplicably dismisses that fact as ineffectual for purposes of reviewing Timmendequas' disproportionality claim. In the past, this Court has maintained that the exercise of precedent-seeking review is undertaken to determine whether a defendant's culpability is greater than that of similarly-situated life-sentenced defendants as well as "whether it equals or exceeds that of other death-sentenced defendants." *Loftin II, supra,* 157 *N.J.* at 335, 724 *A.*2d 129 (quoting *DiFrisco III, supra,* 142 *N.J.* at 184, 662 *A.*2d 442). Of course, a defendant cannot prove disproportionality merely by pointing out that his or her culpability is less than that of the other death-sentenced defendants. What is required is that demonstration plus a showing that the defendant's culpability is "more like that of similar life-sentenced defendants." *Martini II, supra,* 139 *N.J.* at 47, 651 *A.*2d 949. In that case, the defendant's sentence of death must be viewed as aberrational, "requir[ing] a reduction of sentence to a life term." *Ibid.*

I further disagree that the other death-sentenced defendant, David Cooper, is less culpable than Jesse Timmendequas. Cooper's sexual assault and murder of a six-year old child by strangulation was a mirror image of Timmendequas' crime. Cooper also had a prior record and was on parole at the time of the murder, but for wilful criminal acts, not for compulsive sexual behavior. Like Timmendequas, Cooper was accorded the (c)(4)(f) (escape detection) and (c)(4)(g) (contemporaneous felony) aggravators.

He also received the benefit of the (c)(5)(h) (catchall) mitigator. Unlike Timmendequas, though, he was not accorded the (c)(5)(a) (extreme emotional disturbance) or (c)(5)(d) (diminished capacity) mitigators. Further, although both defendants had abusive childhoods, there was no evidence in Cooper's case of the horrifying sex abuse Timmendequas and his brother (who, perhaps not coincidentally, has also turned out to be a sex offender) endured throughout their childhood. It is clear, then, that Timmendequas is less culpable than Cooper because he presented much more mitigation. Thus, both death sentenced cases support Timmendequas' disproportionality claim.

As for the cases in which the defendants received life sentences, the majority has concluded that Timmendequas is less culpable than Jerome Dennis and Leroy Taylor and equally culpable to James Henderson and Michael Manfredonia, none of whom was sentenced to death and that those four cases support his claim of disproportionality. I agree with that conclusion. I also agree with the majority that Timmendequas is more culpable than Mark Luciana. It is here that I part company from my colleagues.

The majority concludes inexplicably that although Vincent Brown,[2] a violent repeat offender, is more "culpable" than Timmendequas because he left the ten-year old victim he sexually assaulted and strangled "to die in a ditch as she screamed for help," Timmendequas is more "death-worthy" because he "penetrate[d] his victim." *Ante* at 46, 773 *A.*2d at 33. The notion of penetration as more death-worthy than extended suffering is totally subjective and the fact that the majority agrees on that does not render it less so. Moreover, the majority's assessment of Brown flies in the face of the cases in which we have held the extent of a victim's suffering to be an aggravator. *See, e.g., Harris II, supra,* 165 *N.J.* at 324–25, 757 *A.*2d 221. From an objective standpoint, Vincent Brown is plainly no less culpable

[2] Because he was suicidal and depressed in jail after the crime, Brown was declared incompetent to stand trial.

than Jesse Timmendequas, yet, as a result of a plea agreement, he was only sentenced to a term of life imprisonment with a thirty-year parole disqualifier plus ten years.

The majority's attempt to distinguish Timmendequas from Ralph Edwards, who accosted a nine-year old girl; exposed himself; sought to penetrate her anally; wrapped a plastic strap around her neck; strangled her; and left her body on the railroad tracks is also unjustifiable. Edwards was subsequently arrested for sexually assaulting a young boy. He was eighteen-years old, but had a history of mental problems and functioned at a much lower level. Unlike Timmendequas, he did not receive the benefit of the c(5)(a) mitigator (extreme emotional disturbance) from the jury. Yet, the majority, again omitting the notion of intellectual/emotional age from its analysis, talismanically cling to Edwards' chronological age as a valid distinguishing characteristic. That is hardly a sufficient basis on which to justify the fact that Timmendequas was sentenced to death while Edwards was only sentenced to life imprisonment with a thirty-year parole disqualifier.

James Henderson and Gary Lippen picked up a seventeen-year old acquaintance. After she refused their advances, Henderson threw her down and began to tear her shirt. Lippen fondled her and held her down while Henderson sexually assaulted her; Lippen may have also sexually assaulted her. Both beat her throughout the assault, including striking her with a stick, and Henderson choked her with his hands. Lippen handed a stick to Henderson, which he placed on her throat. Lippen put his hand on the stick and the two men crushed the victim's throat. Henderson then stabbed her many times in the chest, genital area, neck and back. They dragged her up a hill and hoisted her legs into a tree. Henderson twisted her legs around the tree and broke them. The victim's dead body was found three months later. Lippen had *no* history of mental illness, although Henderson did. Despite the staggering violence of this crime, the majority only views Henderson as "similarly deathworthy" to Timmendequas. *Ante* at 48, 773 *A.*2d at 34. In fact, he is manifestly more deathworthy,

although his case supports Timmendequas' disproportionality claim even accepting the majority's view that the two are equal.

Moreover, the majority characterizes Lippen as less deathworthy, because he was nineteen-years old and essentially in Henderson's thrall. Again, it gives no recognition to the notion that chronological age is not the end of the inquiry. Also, the suggestion that Henderson's influence renders Lippen less deathworthy than Timmendequas is impossible to square with the recent majority opinion in *State v. Morton*, 165 *N.J.* at 252, 757 *A.*2d 184 (holding that although co-defendant "primarily planned the robbery and murder, defendant willingly participated in the crimes" and so defendant's own "culpability in planning the murder should not be diminished").

Interestingly, although Henderson and Lippen's victim was not found for three months, the majority does not consider her family's suffering in assessing culpability as it does in this case. It is thus impossible to avoid the conclusion that the majority's assessment is based solely on the aggravating factors of Timmendequas and the meager mitigating factors of Henderson and Lippen. That kind of analysis has no place in proportionality review, a scheme meant to compare all aspects of the cases under review. Under the correct approach, Henderson is clearly more culpable and Lippen is at least equally as culpable as Timmendequas. Yet, only Timmendequas sits on death row, Henderson having pled guilty to murder, for which he received a sentence of life imprisonment with a thirty-year parole disqualifier, and Lippen having pled guilty to aggravated manslaughter, for which he received a thirty-year sentence with fifteen-years parole ineligibility.

Rasheed Muhammad kidnaped, sexually assaulted and strangled an eight-year old girl. Muhammad did not even argue at trial—and so no jurors found—that mitigating factors c(5)(a)(extreme emotional disturbance) and c(5)(d)(diminished capacity) applied to his case. Although he too received the benefit of the c(5)(h)

(catchall) mitigator, the absence of the other mitigators plainly renders him at least equal to Timmendequas. Moreover, because it "appears" to the majority that Muhammad "confessed without attempting to outwit the police and the victim's family," it concludes that Timmendequas' pathetic attempts to evade law enforcement make him the more deathworthy of the two. *Ante* at 49, 773 *A.*2d 35. In fact, Muhammad did not voluntarily turn himself in to the police; rather, the police were led to his apartment where they found the body of his victim underneath a pile of clothes in his closet.

The majority also views Jesse Timmendequas as more culpable than Frederick Ritchie, both of whom committed murders contemporaneously with other felonies and with the intent to escape detection. Ritchie enticed the victim, a twelve-year old boy, to sneak out and come to his trailer, where Ritchie got the victim drunk. While reading pornographic magazines, Ritchie masturbated and penetrated the victim with a dildo. Ritchie claimed that the victim, due to the intoxication, fell into the washing machine and then ran into a tree, severely injuring himself. Later, Ritchie wrapped the victim in a blanket and took him, *alive,* to a creek in the nearby woods, where he died from drowning and head injuries. Ritchie then cleaned his trailer and discarded any evidence of the victim's presence in an effort to avoid being caught. He confessed after he was arrested for sexually assaulting another seven-year old child.

In comparison to Timmendequas, Ritchie had a worse prior record, including prior convictions for burglary; lewd and lascivious/crimes against children; indecent exposure; and indecent proposal to a child. However, the majority notes that he was an Army veteran and had been diagnosed with Crohn's disease, as though those were somehow mitigating. The majority also notes Ritchie was an alcoholic who had received treatment in the past, a fact that it views as evidencing "diminished capacity." *Ante* at 50, 773 *A.*2d at 35. From an objective standpoint, his capacity was no more diminished than that of Timmendequas, who, unlike Ritchie,

actually received the benefit of that mitigator from the jury. Thus, there is absolutely no rational basis for Jesse Timmendequas to be on death row while Ritchie continues to serve a life sentence.

The majority's conclusion that Alphonso Timpson, on whom a life sentence was imposed, is less death-worthy than Timmendequas is also belied by the record. Timpson, who was nineteen-years old, forced a twelve-year old girl into the woods as she was walking home from school. She fought him, but he beat her severely and knocked her unconscious. He penetrated her vagina with his fingers and his penis. He also nearly bit off her breast. The victim screamed when she regained consciousness. He then stuffed her panties in her mouth, and she suffocated and died. As she was gasping for breath and dying, he continued to sexually assault her.

Timpson initially denied involvement, but ultimately confessed. Timpson had severe developmental disabilities and was borderline mentally retarded. He was diagnosed as being highly impulsive and unable to exhibit emotional control. He abused drugs and alcohol. As a juvenile, he attacked a girl under similar circumstances to this offense. Timpson pled guilty to capital murder, aggravated sexual assault and kidnaping. The court found the c(4)(c) (torture or depravity) and c(4)(g) (contemporaneous felony) aggravating factors and the c(5)(a) (extreme emotional disturbance), c(5)(c)(age), c(5)(d) (diminished capacity), and c(5)(h) (catchall) mitigating factors. Timpson differs from Timmendequas only in that Timmendequas was given the c(4)(f) (escape detection) aggravator and Timpson the c(4)(c) (torture and depravity) aggravator. Who would not conclude that torture and depravity are worse? Yet the court imposed an aggregate sentence of life imprisonment plus fifty years with a fifty-five-year parole disqualifier on Timpson while Timmendequas was condemned to death. There is simply no principled way to declare Timpson is less death-worthy than Timmendequas. His crime was more brutal and involved torture and imprisonment. His mitigators were

identical. Only his age is different. But given that both he and Timmendequas are retarded and developmentally disabled, his chronological age cannot be the basis on which to justify the fact that he will live out his life in prison while Timmendequas will be executed.

It is almost impossible to tell from the entirely superficial and limited case summary whether Lester Wilson was more or less culpable than Jesse Timmendequas. However, this much is clear: Wilson sexually assaulted and strangled a fourteen-year old girl and, without *any* evidence of the kind of mitigation present in this case, was not even prosecuted capitally.

Thus, of the fourteen agreed-upon cases, Jesse Timmendequas is less culpable than both death sentenced defendants; equal to or less culpable than ten life sentenced defendants; more culpable than one life sentenced defendant and unable to be compared with one life sentenced case. In sum, twelve of the thirteen cases that contain sufficient information to be of use at this stage of proportionality review support Timmendequas' disproportionality claim.

## B. Additional Case Comparisons

The majority has accepted seven of the ten additional cases as comparable, because of the vulnerability of the victim. (Conley, Masini(two), Mincey, Rivera, James and Vasquez). I accept them as comparable as well.

I agree with my colleagues in the majority that both Masini (two cases), who murdered four elderly persons, and Vasquez are more culpable than Timmendequas. I also agree that Conley is equally culpable, thus automatically rendering four out of the seven cases supportive of Timmendequas' disproportionality claim.

Samuel Mincey's life sentence also bolsters Timmendequas' disproportionality claim. Mincey, who had an extensive prior record and no mitigating evidence, raped and murdered a seventy-three-year old woman. In the course of the crime, he tortured her. The majority concludes that, although Mincey is "roughly as culpable" as Timmendequas, because the prosecutor did not seek a

death sentence against Mincey as a result of an erroneous belief that the statute of limitations had run, a valid basis for the discrepancy between Mincey's life sentence and Timmendequas' death sentence is thereby established. *Ante* at 53, 773 *A*.2d at 37. The fact that the prosecutor misunderstood the law is irrelevant in assessing the proportionality of Timmendequas' death sentence; indeed, it provides a clear illustration of the arbitrary way in which capital punishment is administered. The simple fact is that Jesse Timmendequas awaits death while an identically culpable person has been granted a life sentence.

How the majority can view Jesse Timmendequas as more culpable than Rafael Rivera is hard to fathom. Rivera lived next door to and had a close, almost familial, relationship with the victim, a seventy-eight-year old widow. While the victim was visiting Rivera and his girlfriend, Rivera went into her apartment to steal from her. However, she returned to her apartment and surprised him. A struggle ensued in which he struck her many times in the face, forearms, ribs and back. He tore her vagina with either his hand or her cane. The cause of death was strangulation.

Rivera had a vast prior record. He also had a history of abusing cocaine, marijuana and alcohol, and he was seen drunk shortly before the murder. The jury convicted him of capital murder, robbery, aggravated sexual assault and burglary and found the c(4)(c) (torture or depravity) aggravator, a factor not present in Timmendequas' case; it did not find the extreme emotional disturbance mitigator. From his record, his lack of mitigating evidence and the sheer violence of his crime, Rivera plainly is more culpable than Jesse Timmendequas. Yet Rivera received life and Jesse Timmendequas death.

I further disagree that Otis James, who committed the asphyxiation murder of an eighty-three-year old woman whom he had sexually assaulted, is less culpable than Timmendequas. He had a long record and had no mitigating evidence of the quality present-

ed by Timmendequas. At worst, then, he is equally as culpable as Timmendequas.

Thus, of the seven comparable life sentenced cases in this category, three (Masini twice) are more culpable than Jesse Timmendequas; the other four are equally culpable; and none is less culpable.

Recapitulating, of the twenty-one cases (fourteen agreed on and seven additional), twenty possess enough information to be useful in our comparison exercise. Of those, Jesse Timmendequas is less culpable than both death sentenced defendants; equal to or less culpable than the sixteen life sentenced defendants; and more culpable than one life sentenced defendant. Moreover, three of the comparison cases, including one that the majority characterizes as equally culpable, were not even prosecuted capitally (Wilson, Conley and Mincey). Thirteen of the twenty-one comparison cases resulted in plea offers by the State. Although under our proportionality review scheme, an occasional sentencing disparity is permissible, the gross disparity demonstrated here between Timmendequas and all other similarly situated defendants shows that his sentence is an aberration.

## V.

Timmendequas advances systemic proportionality claims with identical evidentiary underpinnings as those the Court rejected last term in *Morton, Harris* and *Feaster.* As I indicated in *In Re Proportionality Review Project*:

The Court is comfortable to continue to 'tinker with the machinery of death,' *Callins v. Collins,* 510 *U.S.* 1141, 1145, 114 *S.Ct.* 1127, 1130, 127 *L.Ed.2d* 435, 438 (1994) (Blackmun, J., dissenting) when we do not yet fully understand the role of racial bias in the operation of our death penalty. I am not. Executions should not be approved while we wait for statistics to be compiled to the point of relentlessness.

165 *N.J.* 206, 234, 757 *A.2d* 168 (2000) (Long, J., concurring in part and dissenting in part).

## VI.

Jesse Timmendequas committed an indescribably horrible crime against a totally innocent child and left her family to suffer a lifetime of loss. He should never be released from prison. But he should not be executed. Proportionality review, to which we have committed ourselves, requires that a defendant not be singled out unfairly for the most extreme punishment. Of the twenty-one comparison cases, all involving terrible sex murders against extremely vulnerable victims—many committed with torture and depravity—only two received death sentences. Both of those defendants presented more aggravating and less mitigating factors than Timmendequas. Of the vast majority who received life sentences (a number of whom were not even prosecuted capitally) only one, Mark Luciana, should be considered less culpable than Timmendequas. Based on that analysis, Jesse Timmendequas has been singled out for death in violation of our promise of proportional sentencing. Thus, his life should be spared.

*For affirmance*—Justices STEIN, COLEMAN, LaVECCHIA and ZAZZALI—4.

For reversal—Justice LONG—1.